**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE CLOISTER EAST, INC. d/b/a CLOISTER CAFÉ

                                  Plaintiff,

       v.

THE NEW YORK STATE LIQUOR AUTHORITY

                              Defendant.

**Civil Action No.:**

---

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION AND FOR PRELIMINARY DECLARATIVE RELIEF**

---

**GARSON, SEGAL, STEINMETZ,**
**FLADGATE LLP**
*Attorneys for Plaintiff*

TABLE OF CONTENTS

UNITED STATES DISTRICT COURT --------------------------------------------------------------------------- 1

SOUTHERN DISTRICT OF NEW YORK ----------------------------------------------------------------------- 1

1.   INTRODUCTORY STATEMENT ---------------------------------------------------------------------- 1

2.   BACKGROUND ----------------------------------------------------------------------------------------- 4

    I.    THE PREMISES AND PRECAUTIONS ------------------------------------------------------------------ 4
    II.   THE GOTHAMIST ARTICLE -------------------------------------------------------------------------- 6
    III.  THE COVID- TASK FORCE ARE SENT OUT TO INVESTIGATE AGAIN -------------------------------- 7
    IV.   THE INVESTIGATION AND SPECIAL FULL BOARD MEETING --------------------------------------- 8
        a)   The Core of the Evidence was Inadmissible and more Prejudicial than Probative. -------------- 8
        b)   The SLA Counsel's Analysis of the Certificate of Occupancy was Wrong. ----------------------- 9
        c)   The SLA Counsel Presents Unsupported and Irrelevant Facts. ------------------------------------ 10
        d)   The SLA Counsel Erroneously Presents the Legal Status of the Public Assembly Permit. ------------ 10
        e)   The SLA Counsel Fails to Inform the Board that the Rolled Down Gate was Manned in Accordance
             with the Law ------------------------------------------------------------------------------------------ 11
        f)   The Forced Pretense of Relying on Facts Other than The Gothamist. ------------------------------ 11
        g)   SLA Counsel Creates Facts Ex Nihilo. -------------------------------------------------------------- 12
        h)   The Board Decision Rested Exclusively on the Irrelevant and Inadmissible. ---------------------- 12

3.   ARGUMENT --------------------------------------------------------------------------------------------- 14

    I.    PRELIMINARY RELIEF --------------------------------------------------------------------------------- 14
        a)   Plaintiff is substantially likely to succeed on the merits on two levels. ------------------------- 15
        b)   Plaintiff will be irreparably harmed if preliminary relief is not granted. ----------------------- 16
        c)   The balance of the equities favors granting the requested relief. ----------------------------------- 17
    II.   PROCEDURAL DUE PROCESS MUST BE FOLLOWED IN DEPRIVATION PROCEEDINGS ---------------- 18
        a)   A Liquor License is a Property to Which Procedural Safeguards Attach. --------------------------- 18
        b)   The Minimum Procedural Requirements to be Afforded. ------------------------------------------ 19
        i.    Notice and Opportunity to be Heard ------------------------------------------------------------ 20
        ii.   The Adequacy of Procedures ---------------------------------------------------------------------- 21
        iii.  Bias and the Inability to Cure ------------------------------------------------------------------- 22

4.   CONCLUSION ------------------------------------------------------------------------------------------ 23

<u>CASES</u>

443 U.S. 55, 64 & n. 1, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) ------------------------------------------------ 19

*Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ----------------------18, 19

*Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) ------------------------------------------------ 20

*Ciambriello v. Cty. of Nassau,* 292 F.3d 307 (2d Cir.2002)------------------------------------------------------ 19

*Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) -------------------------------------------- 20

*Gilbert v. Homar,* 520 U.S. 924, 930, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997)------------------------------------- 20

*Green v. Bauvi,* 46 F.3d 189 (2d Cir.1995) ------------------------------------------------------------------- 18

*Loudermill,* 470 U.S. at 541, 105 S.Ct. 1487------------------------------------------------------------------ 18

*Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)---------------------------------------19, 21

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Doe,* 868 F. Supp. 532 (S.D.N.Y. 1994)------------------------------ 15

*North Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38 (2d Cir. 1999) --------------------------------------------- 14

*Polymer Technology Corp. v. Mimran,* 37 F.3d 74 (2d Cir. 1994) ------------------------------------------------- 14

*Reuters Ltd. v. United Press International, Inc.,* 903 F.2d 904 (2d Cir. 1990) ---------------------------------------- 14

*Spinelli v. City of New York,* 579 F.3d 160 (2d Cir. 2009)--------------------------------------------------------19, 20

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27 (2d Cir. 1995)---------------------------------- 14

<u>STATUTES</u>

The New York State Administrative Procedure Act §401(3) -----------------------------------------------22

1. **Introductory Statement**

The COVID-19 Pandemic has crippled the lives of many and razed the hospitality industry such that servers, bar staff, bussers and hosts have been reduced to penury. The bars and restaurants of New York City have not only had to undergo months of drought, but those that wish to reopen have had to rethink business plans and layouts in order find harmony in the balance of safety to patrons, staff and the health of the general public. This is certainly true in the case of, Cloister East Inc., owner and operator of Cloister Café ("Cloister East" or "Cloister Café"[1]) the Plaintiff in this matter, which devised a COVID-19 compliant space, with full staff training, to allow its staff to go back to work and recoup some of their losses.

Conversely, the emergency powers granted to the New York State Liquor Authority (the "Board"), have been used as license to impose a form of martial law, where:

i)    COVID-19 pretexts can be used as a basis of temporary revocation of licenses;

ii)   Rules of evidence are openly ignored;

iii)  Clearly erroneous conclusions of facts or law are accepted as true;

iv)   Irrelevant facts are taken into account;

v)    Relevant facts are not taken into account;

vi)   Biases are openly expressed;

vii)  The bases for temporary are not even included in the Notice of Pleading; and

---

[1]Importantly, the Gothamist Article (defined below) misreported that Cloister East was the Café Tucano concept, which was to occupy the outdoor street dining space, and which was in the process of being, but not yet launched.

1

viii)    There is no mechanism to remove adjudicators that have expressed biases and prejudices.

This is displayed in an emergency hearing to revoke a license held by the Drobenko family for over 30 years, and affecting the livelihoods of over 40 New Yorkers in what can only be described a Kangaroo Court and which should be used as exemplar of why Procedural Due Process is constitutionally safeguarded.

On August 7, 2020, the Board held a Special Full Board Meeting to vote on whether to suspend the license of Cloister East. What transpired was a parody of justice, where the Board relied nearly exclusively on an article posted on thegothamist.com (the "Gothamist," and the "Gothamist Article") that made numerous baseless, incorrect and uninformed allegations about Cloister East. See Declaration of Nicholas Drobenko dated August 17, 2020 ("Drobenko Decl.") To bolster its position, the Board also relied upon completely incorrect conclusions of fact and law concerning the legality of the use of the space – arguably, well outside its mandate and certainly in an area which it declined, seemingly purposefully, to properly inform itself.

The Board meeting was held remotely and recorded complete with the biases, misdirection, and particularly, the reliance on the Gothamist Article which is perfectly clear.[2] Worse, it is equally clear that the livelihoods of the owners and employees of Cloister Café (and presumably hundreds of others) should not be taken away by such a sham procedure, where genuine facts and investigator reports are set aside in favor of an article in a publication currently

_____

[2]Due to COVID-19 and filing this electronically, the Clerk informed Plaintiff that we are unable to attach the video at this time. However, the Clerk assured Plaintiff that once the above-captioned action is assigned, Plaintiff will be able to provide Your Honor with a copy of the video.

brandishing headlines such as "Free Stuff Alert: 75,000 Ball Pit Balls Only Used A Bit During the Peak Of The Pandemic" and "Hey De Blasio, Kill The Lights So We Can Marvel At This Comet."

Plaintiff's operation was devised to be, and was, legal, safe, and above and beyond the required standards to operate an outdoor dining establishment at this time. For no reason other than the Instagram posts of one @kristinaformayor, a contributor for Gothamist.com and latent biases, Cloister Café has been shut down, and its forty-plus employees have been deprived on their livelihoods, absent anything resembling due process.

For these and the following reasons, Plaintiff respectfully requests that the Court order that pending a Preliminary Injunction Hearing and determination by the Court on this Order to Show Cause, and until further order:

i.    A declaration by this Court that Plaintiff's right to due process and equal protection under the United States Constitution have been violated;

ii.   A temporary and permanent injunction staying the suspension of Plaintiff's liquor license pending a fair and appropriate hearing that meets the requirements of the United States Constitution;

iii.  Compensatory damages for all lost income as a result of Defendant's conduct;

iv.   An award of reasonable attorneys' fees and costs incurred in this action; and,

v.    Any such further relief this Court deems just.

**2. Background**

    **I. The Premises and Precautions**

Cloister Café has operated in the East Village of Manhattan for over 30 years as a whimsical medieval themed restautant, known for its vine covered outdoor space, gargoyles, stained glass windows and hookah lounge.  Notably, throughout its expansive lifetime, by New York City standards, Cloister Café and its owners, the Drobenko family, have never been brought before the Board for violating the law. Drobenko Decl., ¶ 3. Following its closure in March, the Cloister Café, its owners and employees suffered with the rest of the restaurant industry.  As it became permissible to operate outdoor dining establishments, Cloister Café prepared to do so in the safest way possible. Seeking the advice of its long-standing hospitality development team, Brian Geftner and Michael Satsky, Cloister Café devised a layout and system of spacing people to more than satisfy the new strictures that have been imposed. Id., at 9.

According to Cloister Café's Certificates of Occupancy, the premise is made up of four separate legal spaces: the cellar, the interior restaurant space, the exterior back patio, and the exterior courtyard.  Drobenko Decl., ¶ 32; Drobenko Decl., Ex. 8.  The interior restaurant space is not, and has not been, in use for anything since March.  Drobenko Decl., ¶ 5. The exterior back patio is open-air, has a retractable fabric canopy, abuts neighboring buildings on two sides, faces and is entirely open to the exterior courtyard, and is open on the rear side by means of a half wall with retractable fabric coverings.  Drobenko Decl., ¶¶ 11 and 33; Drobenko Decl., Ex. 7.  The exterior courtyard is open-air, abuts neighboring buildings on two sides, is open to the street in the front, and is open to the rear patio, with natural vines between the neighboring building for shade over the courtyard.  Id.

The premises are made up of two tax lots. Drobenko Decl., ¶ 32; Drobenko Decl., Ex. 8. The first, Lot 32, is comprised of a cellar, an indoor restaurant space and the exterior back patio.  Id. The second, Lot 31, is the exterior courtyard.  Id. Lot 32 - the cellar, indoor space, and outdoor patio - has a stated capacity of 141 as designated by the DOB: 5 in the cellar, 74 in the outdoor space, and 62 in the indoor space. Id.   The designation "OS P" indicates that it is designated an outdoor space by the DOB.  Id.

The courtyard, again a separate tax lot, has a capacity of 60, as designated by the DOB Drobenko Decl., ¶ 32; Drobenko Decl., Ex. 8. Like the outdoor patio, the courtyard is clearly designated as an outdoor space.  *Id*.

Despite being open-air and compliant with all regulations, for the safety of its patrons and employees, the owners of Cloister Café also installed fans and multiple portable exhaust ventilating systems to increase air circulation. Drobenko Decl., ¶ 6.

Cloister Café could be visited by reservation only. Drobenko Decl., ¶ 10.  Masks were distributed to patrons and were required when not seated. Id. at. 40. Symptom screenings were performed at the entrance.  *Id*. 41. Tables were spaced at least six feet apart.  *Id*.  Patrons were allowed inside only to use the restroom, and food and drinks were served to the tables.  Id. at 12. Employees wore masks and gloves, and consistently reminded patrons about the Center for Disease Control and Prevention ("CDC") requirements.  *Id*. at 6. Hand sanitation stations were set up, and their use was emphasized to employees and patrons.  *Id*. at 42.  Cloister Café operated with the same degree of caution as, if not more than, any every other outdoor dining establishment that continue to operate today.

Prior to August 7, 2020, the New York Police Department ("NYPD" and Fire Department of New York ("FDNY"), as well as the New York City Sheriff's department, had performed site visits at Cloister Café on numerous occasions, and which was operating in exactly the same fashion and found no violations whatsoever.  Drobenko Decl., ¶¶ 13-14.

## II.  The Gothamist Article

On August 4, 2020 at 2:43 p.m., Gothamist.com published an article entitled "Illicit, Underground Pandemic Parties Continue to Proliferate In Manhattan Venues."  Drobenko Decl., Ex. 2.  The article is based entirely on social media posts and statements of Kristina Alaniesse, who runs an Instagram account under the handle @kristinaformayor ("Alaniesse").  Alaniesse, whose background and expertise are unclear, according to the article, uses her Instagram account by acting as "a clearing house of sorts for photos and videos documenting reckless pandemic partying" for her 900 followers. A review of account, however, shows a mix of selfies and political statements, with a few pandemic parties interspersed over the last few months.

The Gothamist Article includes a broad statement from Alaniesse that "In Manhattan, clubs pay hosts or promoters or models to just sit at a table and look good to fill up the club with beautiful people, in order to sell tables to the rich people willing to pay up to $5,000 to a table." Drobenko Decl., Ex. 2.   This statement, while not directly alleging that Cloister Café employed this strategy, was central to the Board's inquiry only a few days later.

Next, the Gothamist Article states "one of the spaces allegedly running these parties is Provocateur, a former Meatpacking District club that closed a few years ago . . . According to sources who have been to events there, as well as videos and photos Gothamist reviewed, they have been operating out of the Café Tucano."  Drobenko Decl., Ex. 2. The Article embeds

Alaniesse's Instagram posts that say exactly that, and contain two videos. *Id*. Notably, while Alaniesse implies that these videos were taken at Cloister Café recently, she does not state such. Id.  Instead, her commentary is devoted to dragging Provocateur through the mud.  *Id*.

According to the Article, a conveniently anonymous source "saw 'hundreds of people, nobody [was] social distancing, nobody [was] wearing masks" a "few weeks ago." Drobenko Decl., Ex. 2. Another anonymous source stated "it's obviously a nightclub environment. People are rolling up in Ubers, Maseratis, everyone's dressed like it's a nightclub."  *Id*.

It should be noted that neither the author of the article nor Alaniesse have been to Cloister Café since it opened during Phase 2.

###    III.    The COVID- Task Force Are Sent Out to Investigate Again

On the night of August 6, 2020 and the morning of August 7, 2020, just three days after the Gothamist Article was posted, and based on the Gothamist Article being received by the New York City Sheriff's Office, the Board sent investigators to Cloister East and subjected Plaintiff to what can only be described as two raids. Drobenko Decl., ¶¶ 18-20.

The former taking place at around 11:15 pm by 4-6 members of the Governor's COVID-19 Task Force, where they undertook a complete investigation, which included calling the State Liquor Authority ("SLA") to confirm and verify that Cloister Café is permitted to serve alcohol past 11:00 pm. Drobenko Decl., ¶ 19 No violations were found or cited, and the task force left around 12:00 am, permitting patrons to continue purchasing food and drinks. *Id*.

A second raid came around 12:20 am on August 7, 2020, a different task force with approximately 10-15 members, accompanied by a press crew. The task force moved amongst patrons and staff, forcing them to move into closer proximity with other patrons, and failing to

obey the social distancing requirements themselves. Drobenko Decl., ¶ 20.  Curiously none of the citations have made their way into the Notice of Pleading.  Id. at ¶ 28, Ex. 6.

    **IV.**   <u>**The Investigation and Special Full Board Meeting**</u>

        ***a)***  ***The Core of the Evidence was Inadmissible and more Prejudicial than Probative.***

According to the SLA's counsel presenting the matter to the Board ("SLA Counsel"), the investigation was prompted based on information having been received by the Sheriff's Office that "illegal parties – pandemic parties" were being held at Cloister Café. Drobenko Decl., Ex. 3. Given this verbiage – language contained in the headline of the Gothamist Article – and the timing of the investigation – three days after publication of the Gothamist Article, it is clear that the Gothamist Article was the catalyst for the investigation and is the only tangible source of any adverse report. Id. Further, SLA Counsel states the Sheriff's Office "showed the investigator social media . . . of a party with people dancing, standing shoulder to shoulder." *Id*. Again, clearly from Alaniesse's Instagram post.

Next, SLA Counsel states that the investigator arrived to find 10 people waiting outside to get in, but also that "apparently, they got wind of the fact that the Sheriff was on his way, so people sort of disappeared." Drobenko Decl., Ex. 3.  While unclear as to the relevance or importance in the context of the Board's enquiry, it seems that 10 people waiting outside, as is required and advisable if the space is too full, was insufficient for SLA Counsel's skewed narrative, so the impression of scattering and furtive activity needed to be cast. Notably, there is no evidence nor corroboration permitting any scrutiny of the statement that people disappeared.

SLA Counsel's language proceeds in a highly charged fashion, laden with unfounded innuendo, for example instead of simply stating the sterile truth that the investigator walked

through the door, SLA Counsel hyperbolized such perambulation into "gained entry" and walked through the interior space, observing no patrons.  SLA Counsel then stated that the investigator, went in and "toward the right, there's a door that leads to what is advertised in some social media as - I think - the secret backyard."  Drobenko Decl., Ex. 5.  Again, this language implying a form of shebeen or speakeasy taken directly from Alaniesse and the Gothamist Article, and fails to present a factual narrative. *Id*. There is no evidence that Cloister Café was "advertis[ing] in some social media."

### b) *The SLA Counsel's Analysis of the Certificate of Occupancy was Wrong.*

SLA's Counsel proceeds with the laden prosecution, "[s]o they went to the secret backyard and observed an illegal structure that was really three walls of neighboring buildings with a ceiling on top." Drobenko Decl., Ex. 5.   This outrageous statement is patently false. First, the "ceiling" allegedly seen by the investigator is a cloth awning over a metal frame.  Drobenko Decl., Ex. 7.   Second, as the floorplan shows, there are only two walls of neighboring buildings, and the side not open to the courtyard is a half-wall with the upper half open for air flow. Drobenko Decl., Ex. 7.   Both are entirely permissible according to the New York Department of Health Guidelines, which state "[f]or the purposes of this guidance, 'outdoor space' is defined as an open-air space designated for the consumption of food and/or beverage, which may have a temporary or fixed cover (e.g. awning or roof) so long as such cover has at least two sides open for airflow." *Id*. Further, it is clear from the Certificate of Occupancy that the space is considered an outdoor space, as it is designated as "OS P." Drobenko Decl., Ex. 8.   In simple terms, the SLA Counsel had no knowledge of the relevant laws and placed an entirely erroneous position of the law before the Board, which was unable or unwilling to scrutinize.

9

### c) *The SLA Counsel Presents Unsupported and Irrelevant Facts.*

The SLA Counsel then proceeds to state that the investigator "saw people mingling, kissing each other, and drinking." Drobenko Decl., Ex. 5. In what was a trend of invention of facts, the investigator's report makes no mention of people being shoulder to shoulder with no masks on, dancing.

Next is where the blatant disregard for facts takes hold. SLA Counsel states: (i) the investigator saw remnants of food, but no one eating; (ii) the investigator reviewed the food receipts, but found them to be suspicious since all of the items per table were not split by patron; and (iii) that there was food in the kitchen and the kitchen was operational. Drobenko Decl., Ex. 5. Rather than any actual evidence being used, the well-established yardstick of forensic analysis, an investigator's gut-feeling was used to cast suspicion. What is altogether more troubling is that it was accepted by the Board.

### d) *The SLA Counsel Erroneously Presents the Legal Status of the Public Assembly Permit.*

SLA Counsel then stated that Cloister Café's Public Assembly permit had expired. Drobenko Decl., Ex. 5. In actuality, when the investigator questioned Mr. Drobenko, he explained that he did not have the display form since they were not being printed due to Covid-19, but instead showed the investigator the receipt showing that he renewed it. Instead of faithfully and accurately reporting the facts to the Board, the SLA Counsel instead submitted that the absence of a physical certificate meant that one did not exist, an incorrect position. Facts were either not presented to the Board or the Board failed to take such a relevant factor into account. Either way, the failure so to do renders the decision subject to review.

### e)   The SLA Counsel Fails to Inform the Board that the Rolled Down Gate was Manned in Accordance with the Law

SLA Counsel further posited that there was a "rolled down gate" (the "Roll Down Gate") that made the environment dangerous. Drobenko Decl., Ex. 5.   She states in passing that there was an exit right next to the gate, which was marked, and the Board only acknowledged the gate being closed. The Roll Down Gate has been operated the same way for thirty-three (33) years without any violation ever having been given. Drobenko Decl., Ex. 4.  At the time of both raids it was open with two (2) separated cloth drapes hanging down to make an opening. *Id*.  There were also two (2) certified fire guards working which allows the fire guards to operate the Roll Down Gate, rendering it compliant. *Id*.  It was closed during the second raid as the investigators brought with them a crew from the gossip television SHOW "Inside Edition" which was filming and photographing patrons using bright blinding lights, creating a hazard which forced the Fire Guards to roll down the gate.  *Id*.  Inside Edition stayed for 2-3 hours along with the SLA Task Force.[3]  *Id*. The failure to mention these facts in an analysis as to whether a safe environment existed at the time, gain subjects the process to review.

### f)   The Forced Pretense of Relying on Facts Other than The Gothamist.

Akin to the habit that most counsel have of using the phrase "With the greatest respect," where none was intended, SLA Counsel then invites the Board to indulge in a charade of Nelsonian Blindness in stating "I would not expect the members to rely on this as evidence," then proceeds to cite to Gothamist Article.  Drobenko Decl., Ex. 5.   SLA Counsel's made the following

---

[3] SLA Counsel states that the investigator observed a few minor violations such as unsecured gas tanks and lighting, and non-flame-retardant curtains, which indicates that the investigator must have been aware that the "ceiling" was in-fact, a cloth canopy since that is the only "curtain" in the outdoor space.

statements based on the Gothamist Article.  *Id*. "It mentions the fact that there's some talk that this might be a pop-up party promoted by Provocateur that we've previously prosecuted many times." *Id*. Clearly, this is prejudicial, as SLA Counsel stated it only to instill a bias.  "These same people are apparently carrying on this pop-up. At this illegal secret backyard, and they renamed themselves Café Tucano." *Id*. This was not a determination made by the Board, but rather, made by @kristinaformayor, rendering this process ripe for review.

> **g)  SLA Counsel Creates Facts Ex Nihilo.**

Last, SLA Counsel states that the investigator noted that the owner was very cooperative, but adds her own opinion, that she thought he was just sorry he got caught. Drobenko Decl., Ex. 5.  This was nowhere on the face of the facts and is not even a reasonable inference that can be drawn from the events on the night and morning of August 6 and 7. This gilding of the lily by SLA Counsel is a step too far, again subjecting the process to review

> **h)  The Board Decision Rested Exclusively on the Irrelevant and Inadmissible.**

The matter of suspension then went to questions before going to a vote. Unsurprisingly, given the skewed and incorrect presentation, each commissioner's questions and/or votes related to information gleaned only from @kristinaformayor, not the investigator.  The first commissioner asked about Provocateur, and SLA counsel responded, "from this article in the Gothamist, it seems they are trying to carry on this pop-up business."  Drobenko Decl., Ex. 2. Another commissioner asked, "What was the event going on that people were willing to pay $300.00 for entry and $5,000.00 per table?"  *Id*.   Figures not found by investigation, but rather, @kristinaformayor. *Id*.   The chairman concluded the questions by stating "Could you just make

clear that the article and video are not evidence? We have no idea what dates those pictures were taken on or if it's even the location." *Id*.

Nonetheless, the first commissioner to vote did so based on the video in the Gothamist Article, stating "[t]his is a situation where pictures speak a thousand words. There are a lot of people standing inside, shoulder to shoulder, with no masks, no social distancing. In a nightclub atmosphere, drinking. I see no food." Drobenko Decl., Ex. 5.   The imagery of people shoulder to shoulder is from the Gothamist, not the SLA investigator.  The "nightclub atmosphere" is a quote from the Gothamist's anonymous source, not the SLA investigator.  *Id*.   "No food" is contrary to the investigator's finding that there were remnants of food, food receipts, and an operational kitchen with food in it.  The first commissioner proceeded to vote to suspend based on these conclusions.

The second commissioner added "I would only add that the property was acting as a hookah lounge with intoxicated individuals."  Drobenko Decl., Ex. 5.   First, a hookah lounge is well within the license of the Cloister Café and second, there was a sound technician but no DJ. The referenced DJ and hookah, as well as the reasons cited by the first commissioner, were all from the Gothamist.  The second commissioner proceed to vote to suspend.

The chair of the Board, in giving his reasoning begins, "[t]he one thing the Gothamist article does do . . .", then voted to suspend. Drobenko Decl., Ex. 5.

Now, based on the Gothamist Article, which is based upon an Instagram post of someone who has never been to Cloister Café, the café is likely to go under, its employees are out of work, and the Drobenko family is in a dire financial situation. This is all due to the fact that the procedure before the Board failed in any meaningful way to resemble any form of judicial

13

proceeding. Especially when exercising its powers ex-parte, a tribunal should be more careful that procedural due process is being achieved rather than being cavalier with the facts and the law.

### 3. Argument

#### I. Preliminary Relief

The Second Circuit's standard for the grant of a preliminary injunction under Fed. R. Civ. P. Rule 65 is well established. As the court in *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33 (2d Cir. 1995) stated:

> A party seeking injunctive relief ordinarily must show: (a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.

See also: *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43 (2d Cir. 1999); *Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 7-78 (2d Cir. 1994); *Reuters Ltd. v. United Press International, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990).

Where, however, a party seeks not simply to maintain the status quo, but pursues a mandatory injunction that serves to alter the status quo, the movant must show a "clear" or "substantial" likelihood of success on the merits (not merely a "likelihood" of success). As the court stated in *Tom Doherty Associates, Inc.*, supra, at p. 34:

> The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits. See Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985). A mandatory injunction, in contrast, is said to alter the status quo by commanding some positive act, See id. As noted above, this distinction is important because we have held that a mandatory injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." Id. (internal quotations and citations omitted); see also SEC v.

Unifund SAL, 910 F.2d 1028, 1039 (2d. Cir. 1990) (injunction going beyond preservation of status quo requires "a more substantial showing of likelihood of success"); Jacobson &amp; Co. v. Armstrong Cork Co., 548, F.2d 438, 441 (2d Cir. 1977). The "clear" or "substantial" showing requirement – the variation in language does not reflect a variation in meaning – thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success. See Unifund SAL, 910 F.2d at 1039.

The standard for preliminary declarative relief is the same. This Court clearly has the power to award preliminary declarative relief. As the Southern District Court stated in *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Doe*, 868 F. Supp. 532, 535 (S.D.N.Y. 1994):

> Given the ability of the Court to issue a final declaratory judgment under 28 U.S.C. Sec. 2201, which is equitable in nature, this Court also has the power to issue such provisional equitable relief when it is necessary, based on the urgency of the situation, the irreparable harm that would otherwise occur, and the remaining factors which courts consider when granting provisional injunctive relief.

The Court then went on to proffer that preliminary declarative relief should be conditioned on the same standards applicable to motions for preliminary injunctions. *Merrill Lynch*, supra, 868 F. Supp. at 536.

Here, Plaintiff is seeking stay the enforcement of the SLA's suspension of its liquor license pending a proper and adequate hearing, such that it can operate its restaurant.  Thus, the relief sought is a mandatory injunction, requiring a showing of a substantial likelihood of success on the merits.

### a)  *Plaintiff is substantially likely to succeed on the merits on two levels.*

To issue the relief sought herein, the Court must find that Plaintiff is substantially likely to success on its claim that it was not afforded due process when the SLA suspended its liquor license. A detailed analysis of Plaintiff's claim is provided below.

However, it is also worth noting that, while it is not necessarily a claim herein, Plaintiff is substantially likely to success in its hearing with the SLA, whenever that may be.  The Notice of Pleading delivered to Plaintiff, nearly a week after being suspended as an emergency related to public health, contains no alleged violations related thereto, implying that the evidence to support those grounds was insufficient to bring them to a formal hearing.  As further explained herein, those violations that did make it into the Notice of Pleading amount to minor and rebuttable charges that would be disproven at a hearing.

### b) Plaintiff will be irreparably harmed if preliminary relief is not granted.

This second factor, irreparable harm, is evident from the Declaration of Nicholas Drobenko filed herewith.  As Mr. Drobenko testifies, Cloister Café will not recover if it is not able to reopen immediately.  Simply, a restaurant cannot survive an extended closure in the best of times, and it is even more starkly evident in the current times.

Leaving aside the monetary income each night, the reputation harm from the Gothamist article and the resulting suspension, without court intervention, will have a lasting and irreparable effect on Cloister Café and its owners' reputation.  If weeks go by without Cloister Café re-opening, the general public will assume the allegations made in the Gothamist article were true, and never return for safety concerns, despite the café having gone above and beyond the required standard to provide a safe and enjoyable atmosphere.

Further, all of Cloister Café's employees, who have submitted letters with this filing to express both their desire to remain open and the safety they felt working there, will be jobless. Even if the suspension only stays in effect for a matter of weeks, those employees will have found other work, and may not return to Cloister Café, leaving the establishment with the gargantuan

task of re-staffing, re-training, and re-opening, all as the result of the deprivation of the establishment's due process.

Last, the closure will have a devastating financial effect on the café's owners and could force them to sell a property they have owned and operated for over 30 years, simply because they were not afforded an opportunity to defend themselves against allegations cast in an online publication.

### c)   The balance of the equities favors granting the requested relief.

The balance of the equities also favors granting the injunction.  Of course, safety is paramount as the city deals with this virus; however, enforcement of such safety regulations must be done within the framework of the constitution.

Cloister Café was open for several weeks prior to the suspension and was inspected numerous times. No reports of illness, unsanitary or unsafe conditions (other than by @kristinaformayor), or other incidents were filed.  As shown through the numerous letters filed herewith, patrons, including politicians facing the same pandemic questions in their districts, front-line medical professionals, and architects all felt safe to visit on multiple occasions and that Cloister Café was being operated prudently.  To allow the entity to continue to operate in the same vein poses no risk to public safety and no harm to the SLA.

On the other hand, shutting the café down will ruin the restaurant, put over forty people out of work, destroy a family business that has operated for over thirty years, and financial decimate the owners.

It is clear that this affects one party significantly more than the other, and while this is a mandatory injunction at law, the injunction would merely return the circumstances to the status

quo of prior to the August 7, 2020 investigation, at which time numerous site visits and inspections had found nothing wrong with Cloister Café.

## II. **Procedural Due Process Must be Followed in Deprivation Proceedings**

The procedural component of the Due Process Clause "provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." *Loudermill,* 470 U.S. at 541, 105 S.Ct. 1487. Therefore, in evaluating a claim for a denial of procedural due process, a court must consider two questions: (1) "whether the plaintiff possessed a liberty or property interest protected by the United States Constitution or ... [by] statute[ ]"; and if so, (2) "what process was due before the plaintiff could be deprived of that interest." *Green v. Bauvi,* 46 F.3d 189, 194 (2d Cir.1995).

### *a)   A Liquor License is a Property to Which Procedural Safeguards Attach.*

As to the first question, property interests do not spring from the Constitution. *See, e.g., Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Rather, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* Moreover, the Supreme Court has determined that, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.... He must, instead, have a legitimate claim of entitlement to it." *Id.* Accordingly, with respect to licenses, while a "person does not have a protected interest in a possible future ... license," since that "involves a purely speculative property interest," once "the government has granted a business license to an individual, the government cannot deprive the individual of such an interest ... without ... appropriate

procedural safeguards." *Spinelli v. City of New York,* 579 F.3d 160, 169 (2d Cir. 2009) (alterations and citation omitted).

Thus, in *Barry v. Barchi,* the Supreme Court found that the respondent "clear[ly] ... had a property interest in his [horse trainer] license sufficient to invoke the protection of the Due Process Clause," given that, "[u]nder New York law," such a license could only be suspended "upon proof of certain contingencies," and not "at the discretion of the racing authorities." 443 U.S. 55, 64 & n. 1, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979); *see also, e.g., Spinelli,* 579 F.3d at 169 (recognizing that plaintiff had a "property interest in [her] gun dealer license" sufficient "to invoke the protection of the Due Process Clause" where "the City did not have unfettered discretion" to revoke or suspend the license (citation omitted)).

### b) The Minimum Procedural Requirements to be Afforded.

Once a court finds that a plaintiff has a protected property interest, as in this case, it must then turn to the second question and determine what process is due before the plaintiff may be deprived of that interest. This question as to what the "minimum procedural requirements" are in a given case is "a matter of federal law." *Ciambriello v. Cty. of Nassau,* 292 F.3d 307, 319 (2d Cir.2002) (citation omitted). That is to say, "[t]he Constitution, not state law sources ..., determines what process is due." *Id.* As a matter of federal law, the "touchstone" of procedural due process is "the requirement that a person in jeopardy of serious loss [be given] notice of" and an "opportunity" to respond to "the case against him." *Spinelli,* 579 F.3d at 169 (alteration in original) (quoting *Mathews v. Eldridge,* 424 U.S. 319, 348–49, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)); *see also Bd. of Regents of State Colls.,* 408 U.S. at 592 n. 7, 92 S.Ct. 2701 ("While many controversies have raged about ... the Due Process Clause, ... it is fundamental that except in

19

emergency situations ... due process requires that when a [s]tate seeks to terminate a protected interest ..., it must afford notice and opportunity for [a] hearing appropriate to the nature of the case before the termination becomes effective." (alterations and citation omitted)).

### i. Notice and Opportunity to be Heard

The notice and opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Fuentes v. Shevin,* 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (citation omitted). "However, due process is flexible and calls for such procedural protections as the particular situation demands." *Spinelli,* 579 F.3d at 170 (citation omitted); *see also Gilbert v. Homar,* 520 U.S. 924, 930, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997) (noting that due process, "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances"). Therefore, in any given circumstance, procedural due process requires a hearing that is "meaningful" and "appropriate to the nature of the case." *Bell v. Burson,* 402 U.S. 535, 541–42, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (citations omitted).

It is undoubtedly the case that no opportunity was afforded to be heard in the emergency suspension process, which is strange given that the purported emergency circumstances have not made their way into the Notice of Pleading, which points to eighteen (18) violations not found twenty (20) minutes earlier by a task force and did not mandate any emergency closure at that time. However, in these circumstances, one should not forget that it is likely to take months for a full hearing to be convened. The New York State Administrative Procedure Act §401(3) ("SAPA") states that agency proceedings founded upon emergency summary suspension of a license requires that the proceedings "be promptly instituted and determined."  Some agencies subject to SAPA have specific rules setting forth timeframes for these proceedings.  The Board does not,

20

which permits the Board to schedule the hearings at its pleasure and leave licensees without their licenses for weeks, if not months.

In such a vein, the Board routinely seeks to insulate itself from Article 78 review by New York Supreme Court citing that courts cannot stay an emergency order of summary suspension and that any Agency actions must be "final and binding before an aggrieved party may seek judicial review under Article 78." *Matter of Bracco's Clam & Oyster Bar, Inc. v. N.Y. State Liq. Auth.*, 52 Misc.3d 1225(A), 3 (Sup. Ct. N.Y. Cnty. 2016) (Bluth, J.) (quoting 150 RFT Varick Corp. v. N.Y. State Liq. Auth., 117 A.D.3d 575, 576 [1st Dept. 2014]).

Understanding that the license would be revoked pending a full hearing and given that the time to entertain outdoors in New York City is limited by the weather, a protracted, drawn out process to challenge the emergency suspension to a liquor license is neither meaningful nor appropriate to the nature of this case.

### ii.  The Adequacy of Procedures

In determining the adequacy of the procedures given and the need for additional process, courts must consider the following three factors identified by the Supreme Court in *Mathews v. Eldridge:*

First, the private interest that will be affected by the official action;

Second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and

Third, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. 424 U.S. at 335, 96 S.Ct. 893.

In applying the above, it is our submission that the current procedures given are clearly inadequate and that additional process is sorely needed. The private interest is substantial as it affects not only the license holder but, as in these circumstances, the livelihoods of many people as well.

Further, in the instant case, a license was taken away on grounds so erroneous that they did not even make their way into the Notice of Pleading. The process is not broken, it is non-existent, and it is our respectful submission that many of the asides and comments made during the emergency suspension hearing have no place in a quasi-judicial hearing. The video of the hearing is evidence enough of the compelling need for proper process in that when incorrect information is presented, with no corroboration, on flawed grounds, on misanalyses of the law, grounded in rumor and double hearsay, erroneous deprivation will undoubtedly ensue.

On the third leg, it cannot be the case that to ask, at the very minimum, that in a hearing which is so pivotal, to have a minimum level of representation so as to ensure that clear errors of fact and law are presented is an undue burden. Simply put, the Board was not placed in a position to make a reasoned decision because the information placed before the tribunal was unreasonably presented. Further, the Board did not seek to provide itself the opportunity to arrive at a reasoned decision and, as such, it falls to this Court to ensure that is avails itself of such an opportunity in the future.

### iii.   Bias and the Inability to Cure

Chairman Bradley, in giving erroneous reasons for the summary suspension of Cloister Café's license then stated at 48:44 that he "recommend[s] that they don't get a license back." This type of open comment, coming from the chairman of the Board, prejudging the eventual

hearing is a clear violation of one of the fundamental underpinnings of procedural due process, and arguably, natural law.

An impartial decisionmaker is an essential right in all civil proceedings "[t]he neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. . . . At the same time, it preserves both the appearance and reality of fairness . . . by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him." *Marshall v. Jerrico*, 446 U.S. 238, 242 (1980). There is also no procedure, through which Chairman Bradley or any of the arbiters of the summary proceedings can be disqualified. In short, the comments of Chairman Bradley to the entire Board might be deemed to have been injudicious and greatly affect the dignity of the law.

### 4. Conclusion

It is our respectful submission that these have been clear and flagrant breaches of procedural due process in this case and that the decision to suspend, even temporarily, the license of Cloister East warranted, at the very least, a hearing which was grounded in reason, fact and law. The fact is that the emergency suspension hearing did not even come close to resembling that which is expected of a quasi-judicial body in the current era and the reliance upon anonymous social media articles, incorrect submissions of law together with evincing clear biases demonstrates that dues process is lacking.

Dated: August 17, 2020

GARSON, SEGAL, STEINMETZ, FLADGATE LLP
*ATTORNEYS FOR PLAINTIFF*

BY:

_____

ROBERT GARSON (RG-1521)
KEVIN KEHRLI (KK-1536)
JACOB PARGAMENT
164 WEST 25TH STREET
SUITE 11R
NEW YORK, NY 10001
TELEPHONE: (212) 380-3623
FACSIMILE: (347) 537-4540
EMAIL: RG@GS2LAW.COM