**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE CLOISTER EAST, INC. d/b/a CLOISTER CAFÉ

                                    Plaintiff,            **Civil Action No.:**

         v.

THE NEW YORK STATE LIQUOR AUTHORITY

                                   Defendant.

Nicholas Drobenko declares the following to be true under penalty of perjury:

1.     I am an owner of the premises located at 238 East 9th Street, New York, New York 10003, as well as an owner of The Cloister East, Inc. d/b/a Cloister Café at the same location, Plaintiff in this action.

2.     Since 1986, I have been a part owner of a restaurant operating at the above-referenced premises.

3.     In my time as owner, the New York State Liquor Authority has never found my establishments to violate their rules or regulations.

4.     As was the case for most restaurant owners, the city-wide closures due to the COVID-19 Pandemic, presented numerous financial hurdles for my business, including insurance and loan payments, taxes, and healthcare.

5.     As we eagerly prepared to open our outdoor space for "Phase 2" of reopening, myself and my colleagues had the safety and welfare of our patrons and employees at the forefront of our concerns.  We restored the entire café, ensured that all permits and certificates were up to date (with the exception of those unavailable due to government closures).

1

6.      To make the space as safe and comfortable as possible, we followed all CDC, DOH, DEC, EPA, and OSHA guidelines with precision and took extra precautions by installing air conditioners and exhaust systems to increase ventilation and circulation.

7.      When the NYDOH established its new street dining program "NYC OPEN Restaurants", it gave us the opportunity to build a new dining area, and to give that dining area the name "Café Tucano". I made it widely known to our clients and neighborhood that this was a plan in development, as I had an artist install a "10 FT Café Tucano" mural on the front of the building on July 10, 2020.

8.      Since April 2018, I have been working on a plan with Michael Satsky and Brian Gefter to develop the 238 East 9th Street real estate into a multi-use hospitality facility.

9.      In order to maximize our revenue during the COVID-19 Pandemic, while keeping the occupancy limited and tables adequately spaced, we consulted with Mr. Michael Satsky and Mr. Brian Gefter, who specialize in curating reservations through a network of personal and professional contacts.

10.     Mr. Satsky and Mr. Gefter are uniquely situated to directly communicate with patrons before they come to ensure that the reservations were sufficiently limited and to ensure the patrons were aware of our safety protocols before they even arrived at the café. Attached hereto as **Exhibit 1** is a letter from Mr. Satsky.

11.     I was assured that the space was considered "outdoor" for these purposes, and the fabric covering hung above a portion of the rear yard space was approved by the Department of Buildings.

2

12.     The outdoor areas of Cloister Café re-opened on or about July 11, 2020 and the indoor space was only used by staff. Other than for use of the restrooms, and entering and exiting, the indoor portion was not used by patrons.

13.     On two occasions, the New York Sheriff's Office inspected the space and found each time that we were compliant with the all COVID-19 regulations.  They clearly came to the conclusion that the space was "outdoor" and that our safety protocols were sufficient, or we would have been shut down on the spot.

14.     The outdoor space was not modified between the New York Sheriff's Office first two visits and August 6, 2020.

15.     On August 4, 2020, the website Gothamist.com published an article that referenced Cloister Café and alleged that we were hosting illegal, illicit pandemic parties. Attached hereto as **Exhibit 2** is a true and correct copy of the article.

16.     It states these alleged parties were being operated out of Café Tucano; however, like the rest of the allegations made in the article, that is incorrect. Café Tucano was going to be the area located in the street space in front of Café Cloister, which has not opened yet.

17.     Seemingly as a direct result of the article, the New York Sheriff's Office allegedly contacted the New York State Liquor Authority to perform an investigation based on "social media" on August 6, 2020.

18.     Cloister Café was raided twice by authorities on August 6th and 7th.

19.     First, at approximately 11:15 pm on August 6th, 4-6 members of the of the Governor's COVID-19 Task Force where they undertook a complete investigation, which included calling the State Liquor Authority to confirm and verify that Cloister Café is permitted to serve

alcohol past 11:00 pm.  No violations were found or cited. They left around 12:00 am, permitting patrons to continue purchasing food and drinks.

20.     A second raid came around 12:20 am on August 7, 2020, a different task force, accompanied by a press crew from "Inside Edition," with approximately 10-15 members where they moved amongst patrons and staff, forcing them to move into closer proximity with other patrons, and failing to obey the social distancing requirements themselves. Curiously none of the citations have made their way into the Notice of Pleading.  To show the police making their way through our space, attached hereto as **Exhibit 3** is a video of the police turning our spaced out restaurant into a more crowded room.

21.     The press crew that accompanied the agents were filming and photographing our space and our patrons using brightly lit cameras.  Our FDNY Certified Fire Guards determined that the potential temporary blindness caused by the lights constituted a safety hazard and opted to roll down the safety gate in order to prevent the "dangerously bright and constant flash" from the media crew.  Attached hereto as **Exhibit 4** are letters from each of our Certified Fire Guards.

22.     The determination was made that the threat posed by the media lights outweighed the need to keep the gate open, given that the gate could be opened or closed in a matter of seconds by turning a key or manual lift. Id.

23.     The investigators did not find some illegal, illicit pandemic party, so they decided to write summonses and reports for minor violations such as a flickering exit sign light, and non-flame-retardant curtains (despite me showing him the affidavit stating they are flame retardant).

24.     The SLA investigator asked us to close the restaurant and we did so.

25.     Later that day, without any notice or chance to appear, the SLA held a Special Full Board Meeting (the "Meeting") to vote on whether to suspend our liquor license.  Attached hereto as **Exhibit 5** is a recording of the Meeting.

26.     I have watched the video of the meeting and feel that the SLA ignored the facts in favor of the Gothamist Article, and that they acted on the basis of public pressure, not health concerns, when suspending our license.

27.     The main basis for the raids and subsequent suspension, accordingly to the pretexts of the Meeting, was COVID-19 safety.

28.      However, on August 14, a week after being shut down on the basis of COVID-19 non-compliance, we received the Notice of Pleading from the SLA that contained no charges, whatsoever, related to COVID-19.  Attached hereto as **Exhibit 6** is the Notice of Pleading.

29.     Based on my understanding of the SLA, the charges contained in the Notice of Pleading would not amount to an emergency situation warranting a suspension of license and immediate closure, and the COVID-19 "Three Strike Rule" was ignored.

30.     Had we been able to represent ourselves at the meeting, we would have shown the SLA that not the investigator's and the Gothamist articles conclusions were untrue.

31.     At my request, Mr. Adrian R. Figueroa, a registered architect in the State of New York for over 26 years, review our filings with the New York City Department of Buildings, and he has provided a letter summarizing his findings, which is attached hereto as **Exhibit 7**.

32.     Mr. Figueroa states "I can attest to the fact that the Cloister Café at 238 East 9th Street (Tax Lot #32) is an Eating and Drinking Establishment with an outdoor space in the Rear Yard and has a connecting Courtyard (Tax Lot #31) open to the sky. Cloister Café has a DOB

Approved Place of Assembly Certificate of Operation #122720314 for 136 occupants issued on 10/11/2017 and a FDNY Place of assembly, expiring on 11/30/2020." Attached hereto as **Exhibit 8** are the premises' Certificates of Occupancy.

33.     Mr. Figueroa continues "Accordingly to DOB Approved Application #121692329 the Rear Yard is considered outdoor, with a DOB approved weather canvas covering and a total legal capacity of 71.  Cloister Café, being cautious and consci[entious], has chosen to have 30 feet of the south wall open to the air and allow natural circulation.  The open-air Courtyard has a legal occupancy of 60."

34.     Mr. Figueroa states "[a]ccording to DOB Approved Applications both outdoor/open air spaces have been legally permitted as Eating and Drinking Establishment[s] for many years."

35.     Mr. Figueroa concludes, "I have personally been to Cloister Café on a number of occasions, during the pandemic, and can say with 100% certainty, that this is an Outdoor Space which is consistent with DOT Open Sidewalk and Roadway Seating Programs, and also both spaces are approved by the DOB and FDNY and therefore legally permitted."

36.     We were not given a chance to present these statements and facts to the SLA.

37.     We have taken every precaution possible to ensure that the café is safe, such that front-line medical doctors, a United Nations Ambassador, and the mayor of a city that implemented and enforces its own COVID regulations are willing to frequently visit the café and equally willing to support us in this time. Attached hereto as **Exhibit 9** are numerous letters from frequent customers.

38.     Dr. Yechiel Zagelbau F.A.A.P, who has been on the advisory boards of numerous camps, synagogues, and schools as the implement precautions during the pandemic states that on August 6, 2020, the doctor observed that "every single recommended safety protocol was followed," that it was "a completely outdoor open air space with even more natural ventilation and circulation than a typical outdoor space," and that "proper safety precautions [were] taken at the door throughout the evening."

39.     Dr. Amir Salem states "with the utmost confidence, that this café followed all rules and regulations to ensure safety and prevention of airborne droplet spread of the virus" and that he had "been to the Cloister café consistently for the last few weeks as it was a place to [him] that [he] considered the safest in the city during this time we live in."

40.     Dr. Adam Y. Goldman, who served as a teaching attending at multiple hospitals teaching and supervising the care of patients with a host of viral, bacterial, and fungal infectious diseases visited the café on multiple occasions and "noted that each guest admitted was screen for symptoms and fever before entry. All the staff in attendance were always wearing appropriate masks and facial coverings. Each guest was monitored for use of a mask and facial coverings and [he] witnessed staff addressing patrons that were not compliant with the regulations when they got up from [their] seating table or entered the indoor premise to use the restroom."

41.     Dr. Liane Zwetzich, who works at the H+H Queens Hospital Center – the former epicenter of the COVID-19 outbreak, acknowledges that she observed "temperature checks at the entrance, giving out mask to the guests, wearing masks when not seated, and adequate distance between tables." She states "just like as Cloister Café, outdoor gatherings is a safer environment for decreasing viral transmission."

7

42.     Dr. Fillipo Filicori, a Board-certified surgeon who was redeployed during the apex of the pandemic to care for critically ill patients with COVID-19, visited the café twice in July.  He found "the staff and its customers to be abiding by all CDC recommendations with regards to social distancing, hand hygiene and mask usage" and "the environment to be adequately ventilated and therefore not a concerning risk for transmission of the disease.

43.     In addition to the front-line medical professionals who found the café to be a safe retreat, Mr. Steven M. Fulop, the Mayor of Jersey City New Jersey visited to café "to see what types of policies could be implemented in Jersey City to allow businesses to continue to operate." Mayor Fulop was informed of the café's mask, capacity and spacing policies.  Mayor Fulop notes that people were not allowed inside despite the rain,

44.     Finally, Ambassador Paolo Zampolli, Permanent Mission of the Commonwealth of Dominica at the United Nations states that the Café is among those in which he feels most safe. So safe, in fact, that he visited with friends almost nightly. "The reason being" he writes, "that it is a complete outdoor venue with fresh and circulating airflow. This flow is further improved by the fans and mobile cooling systems installed at the Venue.

45.     Like our patrons, our forty employees, with my daughter Kristina and son Adrian among them, felt safe and depended on us for their livelihoods.  Attached hereto as **Exhibit 10** are numerous letters from our employees explaining their positions.

46.     The Board spoke of our use of Hookah being illegal, but attached hereto as **Exhibit 11** is our permit.

47.     The Board spoke of our curtains not being flame retardant, but attached hereto as **Exhibit 12** is our Certificate of Flame Resistance.

8

48.     Our safe and legitimate business was stripped away from us on the basis of an article based on a single social media post from an individual who does not even claim to have been to the café.  Worse, we were not afforded an opportunity to defend ourselves against these allegations.

49.     Now, those emergency bases for suspending our license do not even appear in our Notice of Pleading.

50.     Our business will not survive another closure, and the financial strain placed on me and my family may be insurmountable.

51.     For these reasons, I respectfully request that the Court issue an order to stay the suspension of our license so that my family and my employees can continue to earn a living by providing a safe and enjoyable environment for the people of New York until we receive a fair hearing on the merits of this vindictive suspension.

Dated: New York, New York
        August 17, 2020

                                                    Nicholas Drobenko

9