UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
THE CLOISTER EAST, INC., et al.,

                    Plaintiffs,

         -against-                            20-cv-6545 (LAK)

NEW YORK STATE LIQUOR AUTHORITY, et al.,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION**

Appearances:

        Robert Garson
        Kevin Kehrli
        Jacob Pargament
        GARSON, SEGAL, STEINMETZ, FLADGATE LLP
        *Attorneys for Plaintiffs*

        Benjamin D. Liebowitz
        Assistant Attorney General
        LETITIA JAMES
        ATTORNEY GENERAL OF THE STATE OF NEW YORK
        *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

        In ordinary times, spring is when life begins to emerge from the proverbial and actual snows of winter after months of hibernation.  But in 2020, spring became a second and more deadly winter.  It was a time when the world was required to engage in extraordinary social distancing measures to halt the spread of the COVID-19 pandemic.  In New York City, many businesses were forced to close, and restaurants and bars in particular lost substantial amounts of revenue.  Although New York's health is much improved and its economy now is trying to recover, some of these

businesses will not survive that journey.

In the past several months, New York City restaurants have been permitted to serve customers in suitable outdoor settings in a manner circumscribed by a complicated and evolving web of State and local regulations.  At the times relevant to this lawsuit, restaurants in New York City that wished to reopen in this way typically were required, among many other things, to ensure that outdoor tables were at least six feet apart, that employees wore face coverings at all times, that patrons wore face coverings except when seated, that patrons sitting together were members of the same party, and that the restaurant did not serve alcohol without serving also food.[1]

Cloister East, Inc., which does business as Cloister Café, is a restaurant hospitality company located at 238 East 9th Street in Manhattan's East Village.[2]  Several members of the

---

[1]

See generally FOOD SERVICES GUIDELINES FOR EMPLOYERS AND EMPLOYEES, N.Y. GOV., https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/Food_Services_Summary_Guidelines.pdf; OPEN RESTAURANTS FAQ, N.Y.C. DEP'T OF TRANSPORTATION, https://www1.nyc.gov/html/dot/html/pedestrians/openrestaurants-faq.shtml; N.Y. STATE LIQUOR AUTH. GUIDANCE ON REQ'T THAT LICENSEES WITH ON-PREMISES SERVICE PRIVS. SERVE FOOD WITH ALCOHOLIC BEVERAGES, N.Y. STATE LIQUOR AUTH. (Jul. 17, 2020), https://sla.ny.gov/guidance-requirement-licensees-premises-service-privileges-serve-food-alcoholic-beverages.

[2]

Amended Cmplt. ¶ 1.

Notwithstanding the fact that the SLA renewed Cloister East's liquor license as recently as July 2019, see Dkt. 30-11 at 15, the SLA takes the position that Cloister East was dissolved on September 29, 1993. Dkt. 27 at 9. It bases this position on information it gathered from the website of the New York Division of Corporations. See Dkt. 30-9 at 1. The SLA's printout of that website refers to the web page www.tax.ny.gov, keyword TR 194.1. Id. When one goes to that web page, one discovers that the procedure for the reinstatement of a corporation appears to consist of little more than paying back taxes and filing a few forms. Accordingly, there is at least some basis for finding that the word "dissolved" is a misnomer in this context. Whatever its tax liabilities, there is no basis for supposing that it has lost ownership or liquidated its assets. In any case, even if Cloister East had been "dissolved" in this sense, the SLA has not explained why that would be relevant for present purposes. While it argues that applying for a liquor license as a "dissolved" entity is an independent

Drobenko family own both Cloister East and 238 East 9th Street and have operated a restaurant at that location, which includes both indoor and outdoor spaces, for over 30 years.[3]  After closing down for several months during the beginning of the pandemic, the Cloister Café reopened as a purportedly outdoor restaurant on July 11, 2020 and alleges it did so in compliance with the applicable State and local regulations.[4]

Since 1987, the plaintiffs have held a liquor license issued by the New York State Liquor Authority ("SLA") in the name of Cloister East.[5]  On August 7, 2020, the SLA board suspended Cloister East's liquor license, finding that the Cloister Café had hosted large, party-like gatherings in violation of at least one Executive Order related to social distancing requirements.  The plaintiffs were not given notice of that hearing nor an opportunity to be heard prior to the suspension of their liquor license, although the SLA alleges that several post-deprivation remedies are available to the plaintiffs.

Before the Court is the plaintiffs' motion for a preliminary injunction requiring the

---

reason for the revocation of its license, the SLA is well aware that the task of determining in the first instance whether a license should be revoked falls on that agency, not this Court.

[3] Amended cmplt. ¶¶ 1-6, 18.

[4] *Id.* ¶ 37.

[5] *Id.* ¶¶ 22-25.

There has been substantial confusion concerning the identity of the licensee, brought on largely by the SLA's inconsistent position during an early conference.  The liquor license itself lists the holder as "The Cloister East Inc" and its address as "Cloister Café."  Dkt. 30-11 at 15.  Both the order of suspension and the notice of pleading refer also to The Cloister East as the entity to whom the documents are addressed.  Dkt. 30-7 at 2; Dkt. 30-8 at 1.  Elsewhere, however, the notice of pleading lists Jaroslaw Drobenko as the "licensee."  Dkt. 30-8 at 3.  The names of the Drobenko family members are not listed on the license, although they own Cloister East Inc and the Cloister Cafe.

4

defendants – the SLA and affiliated parties – to reinstate their liquor license.  They raise also other, less immediately pressing claims.  For the following reasons, the plaintiffs' motion is denied without prejudice to renewal in limited circumstances.

<em>Facts</em>

The Court draws the following facts from the amended complaint and the parties' various submissions.  Unless otherwise noted, the facts are undisputed.

*The SLA and Its Authority*

The SLA is an agency of the State of New York that is created by and responsible for administering the New York State Alcohol Beverage Control Law ("ABC Law").  In recent months, it has been charged with enforcing several executive orders issued by the Governor of New York in response to the COVID-19 pandemic.[6]

The SLA has the authority, subject to the ABC Law and applicable regulations, to issue, suspend, and revoke liquor licenses.[7]  Under Section 118 of the ABC Law, the SLA "may" revoke or suspend licenses "for cause" and "must" suspend licenses for certain causes not relevant here.[8]

---

[6]   Dkt. 27 at 5.

[7]   *See* N.Y. ALCO. BEV. CONT. LAW § 17.

[8]   *Id.* § 118, subd. 1; *see also id.* § 17, subd. 3 (granting the SLA the authority "[t]o revoke, cancel or suspend for cause any license or permit issued under this chapter and/or to impose a civil penalty for cause against any holder of a license or permit issued pursuant to this chapter").

The phrase "for cause" is not defined by the ABC Law.  But Section 118, subd. 3, states that "the term 'for cause' shall also include" (1) "the existence of a sustained the existence of a sustained and continuing pattern of noise, disturbance, misconduct, or disorder on or about the licensed premises, related to the operation of the premises or the conduct of its patrons, which adversely affects the health, welfare or safety of the inhabitants of the area in which such licensed premises are located," and (2) "for licensees that sell alcoholic beverages for on premises consumption, deliberately misleading the authority [in two specified ways]."[9]  Additional and more broadly applicable causes are found in the SLA regulations.  Section 53.1 of those regulations contains over a dozen causes for which a license "may be revoked, cancelled or suspended," including the violation of any provision of the ABC Law or any SLA regulation.[10]

When the SLA either must or chooses to revoke or suspend a liquor license pursuant to this authority, it ordinarily must do so in accordance with the procedures set forth in ABC Law Section 119.[11]  Under Section 119, subd. 2, the SLC may suspend or revoke a retail liquor license "after a hearing at which the licensee shall be given an opportunity to be heard."[12]  Both the ABC Law and Section 54 of the SLA regulations set forth numerous procedural requirements for such hearings.  These include giving the licence holder notice of the SLA's pleading and its possible

---

[9]     *Id.* § 118, subd. 3.

[10]    9 N.Y. COMP. CODES R. & REGS. § 53.1.

[11]    N.Y. ALCO. BEV. CONT. LAW § 119, subd. 1 ("Any license or permit issued by the liquor authority pursuant to chapter one hundred eighty of the laws of nineteen hundred thirty-three or this chapter may be revoked, cancelled or suspended and/or be subjected to the imposition of a monetary penalty in the manner prescribed by this section.").

[12]    *Id.* § 119, subd. 2.

consequences (*i.e.*, revocation or suspension);[13] providing the license holder the opportunity to respond to the charges with a pleading;[14] and, once the hearing commences, providing the license holder the rights to appear in person with counsel,[15] to produce evidence,[16] and to have the matter resolved by an administrative law judge who "shall, at his option, recommend to the authority the action to be taken against the licensee."[17]  If the charges are sustained by the administrative law judge, the SLA "may direct revocation, cancellation[,] or suspension of the license."[18]

There is at least one other way that the SLA can suspend a liquor license, and it is relevant here.  Certain New York agencies, including the SLA with regard to liquor licenses, have the authority under Section 401, subd. 3, of the New York State Administrative Procedure Act ("SAPA") to order the summary suspension of a license – that is, without any notice to the licensee or any pre-suspension opportunity to be heard.  They may do so if they "find[] that public health, safety, or welfare imperatively requires emergency action, and incorporate[] a finding to that effect in its order."[19]  Such suspensions must be made "pending proceedings for revocation or other action"

---

[13]     9 N.Y. COMP. CODES R. & REGS. § 54.1.

[14]     *Id.* § 54.2.

[15]     *Id.* § 54.3.

[16]     *Id.*

[17]     *Id.* § 54.4

[18]     *Id.* § 54.6.

[19]     N.Y. ADMIN. PROC. ACT § 401, subd. 3.

that "shall be promptly instituted and determined."[20]

*The Events of August 7, 2020*

Shortly after midnight on August 7, 2020, an investigator from the SLA and numerous detectives and deputies with the New York City Office of the Sheriff visited the Cloister Café.[21]  According to the declaration of the SLA investigator, Officer Charles R. Stravalle, the Sheriff's Office had received reports of prohibited activity at the Cloister Café, including a video obtained from social media showing what Stravalle describes as "a large party where there was dancing, people standing shoulder-to-shoulder[,] and a DJ playing music."[22]   Mark D. Frerring, associate general counsel to the SLA, declares in addition that between July 12, 2020 and August 5, 2020, the New York City Police Department had received thirty-five 3-1-1 calls complaining about "loud music, people partying inside, and crowds congregating with no social distancing."[23]

Upon arriving at the Cloister Café on August 7, 2020, Stravalle claims that he and his team concluded, based on their observations, that the restaurant was:

"(1) allowing patrons to be served in an indoor space, (2) allowing such service to occur while patrons inside were not sufficiently adhering to social distancing requirements, and (3) allowing such service to occur while patrons were congregating on the sidewalk area in the front of the entrance to the premises without

---

[20]

*Id.*

[21]

Amended Cmplt. ¶ 42; Dkt. 30-2 at 2; Dkt. 30 ¶ 34.

[22]

Dkt. 28 ¶ 13.

[23]

Dkt. 30 at 8.

sufficiently adhering to social distancing requirements."[24]

According to the Sheriff's Office's investigative report, "[o]ver 50 people were occupying the space inside the establishment, which included a bar area located toward the front and an outdoor seating area located in the western portion of the location."[25]   The report stated also that "patrons were consuming alcohol and mingling amongst each other."[26]   It stated also – although other evidence that will be discussed momentarily contradicts this statement – that "all patrons were donning facial masks."[27]   The investigative team stayed at the Cloister Café for several hours and documented what Stravalle asserts were 33 violations of various laws and regulations.[28]

Some of these observations are corroborated by videos taken by the investigators and submitted to the Court.[29]   As relevant here, these videos appear to show that the Cloister Café was operating past midnight on August 7, 2020, that dozens of well-dressed patrons were either seated at tables or standing and congregating in what appears to be an at least partially enclosed space covered by a cloth ceiling,[30] that these patrons were consuming alcohol and using hookah pipes, that

---

[24]    Dkt. 28 ¶ 16.

[25]    Dkt. 30-2 at 3.

[26]    *Id.*

[27]    *Id.*

[28]    Dkt. 28 ¶ 16.

[29]    *See* Dkt. 28-2.

[30]    The parties dispute how many walls surrounded the space; the plaintiffs argue two, and the defendants argue three.   The Court makes no findings on this disputed question and refers to the space as at least "semi-enclosed" or "partially enclosed" because the parties agree that

a substantial majority of the individuals who appear to be patrons were not wearing masks, and that a bartender, who was wearing a mask and located in what appears to be an indoor bar, was serving alcohol to patrons within that space.  Put more simply, the video appears to depict a nightclub-like party taking place in a lounge setting under a large tent covering.

In their amended complaint, the plaintiffs assert that their outdoor space complied with the applicable regulations because it was enclosed at the sides by only two walls and had a cloth covering.[31]  While they do not say so directly, they appear to acknowledge that the Cloister Café was operating and serving customers in this space at approximately 12:20 in the morning when the investigative team arrived and for some time thereafter while the investigators were present.[32]  They allege, and the videos appear to confirm, that they cooperated with the investigation and, in particular, that Mr. Nicholas Drobenko, one of the owners of Cloister Café, was present when the investigators arrived.[33]

Following the investigation, the New York City Sheriff's Office issued seven criminal summonses to Nicholas Drobenko.[34]  The summonses included, among other things, an allegation that Mr. Drobenko had violated an executive order of the Mayor of New York City for

---

the space was surrounded by at least two walls and was covered by a cloth ceiling.

[31]  Amended Cmplt. ¶¶ 34, 43, 107.

[32]  *Id.* ¶¶ 42, 73, 75, 106.

[33]  *Id.* ¶¶ 44-45.

[34]  Dkt. 30 ¶ 35; Dkt. 30-2 at 4-7.

failing to comply with social distancing requirements.[35]

*The Summary Suspension*

At or around 3 p.m. on August 7, 2020,[36] the SLA's board held an emergency meeting concerning, among other things, the investigation that had taken place earlier that day at the Cloister Café.  The plaintiffs were not given advance notice of this meeting and were not provided an opportunity to be heard.[37]  At the meeting, videos of which have been provided to the Court,[38] members of the SLA board reviewed the investigative report and a checklist of alleged violations prepared by Officer Stravalle, a report from the New York City Sheriff, photographs that appear to have been taken during the investigation and in one case show individuals seated at tables in a dark and at least partially enclosed space, and an August 4, 2020 article from the website Gothamist.com alleging that the Cloister Café was hosting "pandemic parties."[39]

Allegedly on the basis of this evidence, and purporting to act pursuant to SAPA Section 401, subd. 3, the SLA board voted to issue an emergency order suspending the plaintiffs' liquor license.[40]  The suspension order begins by reviewing the requirements of several executive

---

[35]    Dkt. 30-2 at 6.

[36]    Dkt. 30 ¶ 44.

[37]    Amended Cmplt. ¶ 46.

[38]    Dkt. 6-5.

[39]    Dkt. 30 ¶¶ 36-38.

[40]    *Id.* ¶ 41.

orders of the Governor of New York: Executive Orders 202.3, 202.38, 202.43, and 202.52.[41]   It
states then that Cloister East Inc. holds a liquor license; that the SLA's Office of Counsel had
offered evidence that, on August 7, 2020, patrons were observed on its premises, both indoors and
in an outdoor area enclosed by three walls and a fabric roof; that the patrons were consuming
alcohol and mingling; and that "this evidence demonstrates that the licensee has violated one or
more of the above-referenced Executive Orders."[42]   The order states that the SLA, on this basis, was
suspending summarily Cloister East's liquor license "until such time as this Order is lifted, or until
a final Order becomes effective in connection with the disciplinary proceeding directed herein to
be commenced by the [SLA]."[43]   According to the Frerring declaration, an SLA investigator notified
Mr. Drobenko in person of the suspension order on August 7, 2020 and took possession of the liquor
license on that date.[44]

       Mr. Frerring declares that on August 10, 2020, the next business day, the SLA served
a notice of pleading on the plaintiffs.[45]   The notice of pleading pertains not to the suspension
proceedings just described, but to the "proceedings to cancel or revoke" the plaintiffs' liquor license
that the suspension order required the SLA to "commence[]".[46]   It contains eighteen charges against

---

[41]
       Dkt. 30-7 at 3-4.

[42]
       *Id.* at 4.

[43]
       *Id.* at 4-5.

[44]
       Dkt. 30 ¶ 43.

[45]
       *Id.* ¶ 44.

[46]
       Dkt. 30-8 at 1.

Cloister East and purports to be issued pursuant to Section 118 of the ABC Law, the above described

provision that allows the SLA to revoke, suspend, or cancel liquor licenses for cause.[47]   Virtually

all of the eighteen charges in the notice of pleading concern alleged fire, health and safety

regulations unrelated to the events described thus far in this opinion.[48]   The one charge that appears

to pertain to social distancing is the first one, which states in full (spelling in context):

> "That on or about August 7, 2020, the licensee violated rule 54.3 of the Rules of the
> State Liquor Authority [9 NYCRR 48.3], in that it did not conform with all
> applicable building codes, and/or fire, health, safety and governmental regulations
> Governor's Executive Order 202.43 regarding violations of social distancing and
> open container laws and associated posted NYSLA and NYDOH Guidance within
> 100 feet from the licensed premises]; all cause for revocation, cancellation or
> suspension of the license in accordance with rule 36.1(f) of the Rules of the State
> Liquor Authority [9 NYCRR 53.1(f)]."[49]

The Court cannot determine which "NYSLA and NYDOH Guidance" the notice of

pleading refers to because it does not cite any.   Executive Order 202.43 provides, in relevant part:

> "In service of the policy goal of preventing the unnecessary congregation of people
> to slow the spread of the novel coronavirus, for businesses engaging in the
> sale/service of alcoholic beverages . . . all such businesses shall be further required
> to inspect, monitor, and otherwise supervise the area within 100 feet of the licensed
> premises to ensure that any consumption of food or beverage comports with the
> applicable open container ordinances, and the social distancing and face covering
> requirements set forth for such business or service in any applicable Executive
> Order, regulation, ordinance, law, Department of Health guidance, and/or State
> Liquor Authority guidance . . . ."

Except for this one charge, the notice of pleading for the revocation proceeding

contains no clear references to alleged social distancing or Executive Order violations.   Mr. Frerring

---

[47]

*Id.*

[48]

*Id.* at 1-2.

[49]

*Id.* at 1 (alterations in original).

declares that "[t]he failure to include [a] charge [for inside dining in violation of Executive Order 202.3] appears to be an oversight that would have been corrected as soon as it was discovered."[50] The notice of pleading requires Cloister East to answer the charges, either by mail or in person on September 2, 2020 at 11 a.m. at a specified location.[51]  As far as the Court is aware, the plaintiffs have not responded to the notice of pleading.

*These Proceedings*

On August 17, 2020, Cloister East filed this lawsuit against the SLA pursuant to 42 U.S.C. § 1983.  The complaint alleged procedural due process and equal protection violations and sought equitable relief requiring the SLA to lift the suspension order and return its liquor license. Cloister East filed also a proposed order to show cause and temporary restraining order ("TRO") concerning the return of its liquor license.

On August 19, 2020, the Court held a hearing at which it heard counsel for Cloister East and the SLA.  The Court construed the order to show cause as notice of a motion for a preliminary injunction and heard oral argument on the plaintiff's application.  It set an expedited briefing schedule for the motion for a preliminary injunction and reserved on the TRO application. The Court denied the motion for a TRO in an opinion issued the following day.[52]

On August 21, 2020, the plaintiffs filed an amended complaint.  It added as plaintiffs

---

[50]

Dkt. 30 ¶ 45.  Mr. Frerring's use of the subjunctive tense here is confusing.  The SLA evidently has discovered the alleged oversight by now.  As far as the Court is aware, the SLA has not corrected it.

[51]

Dkt. 30-8 at 1.

[52]

Dkt. 15.

four members of the Drobenko family and a company owned by them that owns 238 East 9th Street.[53]  And it adds as defendants the chairman of the SLA, two of its commissioners, its general and associate counsel, its secretary, and Mr. Stravalle.[54]

The motion for a preliminary injunction has been briefed and is ripe for determination.

*Discussion*

"District courts may ordinarily grant preliminary injunctions when the party seeking the injunction demonstrates (1) that he or she will suffer irreparable harm absent injunctive relief, and (2) either (a) that he or she is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party."[55]

The amended complaint asks for injunctive relief on three bases.  The first claims that the summary suspension of the plaintiffs' liquor license violated the rights to procedural due process.  The second refers to the license revocation proceeding commenced by the SLA's notice of pleading.  The third is an equal protection claim based on the alleged unequal treatment of the plaintiffs in the summary proceeding.

---

[53]    Amended Cmplt. ¶¶ 1-6.

[54]    *Id.* ¶¶ 7-14.

[55]    *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005) (Sotomayor, *J.*) (citations and quotation marks omitted).

    This standard remains in effect.  *See Citigroup Global Markets, Inc. v. VCG Special Opps. Master Fund Ltd.*, 598 F.3d 30, 34-38 (2d Cir. 2010).

*I.      Procedural Due Process Claim – Summary Suspension Proceeding*

Under the Fourteenth Amendment to the U.S. Constitution, "[n]o state . . . shall . . . deprive any person of life, liberty, or property, without due process of law."[56]  "To determine whether a plaintiff was deprived of property without due process of law in violation of the Fourteenth Amendment, we must first identify the property interest involved.  Next, we must determine whether the plaintiff received constitutionally adequate process in the course of the deprivation."[57]

The Court assumes without deciding that a New York State liquor license is a property interest to which the protections of the Due Process Clause attach.  It focuses therefore on the constitutional adequacy of the pre-deprivation procedure used by the SLA to suspend the license and the post-deprivation procedures available to the plaintiffs.

Determining whether the SLA provided the plaintiffs constitutionally adequate process in the course of suspending their liquor license requires the application of the balancing test set forth in *Mathews v. Eldridge*.[58]  The Court must weigh:

"First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."[59]

---

[56]      U.S. CONST. amend XIV, § 1.

[57]      *O'Connor v. Pierson*, 426 F.3d 187, 196 (2d Cir. 2005).

[58]      424 U.S. 319 (1976).

[59]      *Id.* at 335.

A.      *Private Interest*

The private interest at stake here is straightforward and strong.  The restaurant industry in New York City is competitive even during ordinary times.  And many restaurants, including the Cloister Café, lost substantial revenue during the early months of the pandemic.  A liquor license is a competitive advantage that helps certain restaurants earn additional revenue.  That revenue comes not only from the sale of liquor, which typically yields a high profit margin, but also from the sale of food to customers who prefer to dine at restaurants that serve liquor.  While a restaurant can survive without a liquor license, and many do, the loss of a liquor license can be devastating for restaurants whose business model is built around being able to serve alcohol.

For these reasons, the Court has no trouble concluding that the private interest at stake here is compelling.  However, the record thus far does not persuade the Court, as the plaintiffs contend, that the Cloister Café will be "unable to operate as a business" or forced to shut down permanently as a result of having its liquor license suspended.[60]  The plaintiffs have failed to provide to the Court sufficient information about the Cloister Café's financial position, such as financial statements, tax returns, or any information about the profitability of the business or the cash positions of its owners.[61]  For example, the Court has little to no information about how much revenue or profit the Cloister Café derives from liquor sales versus food sales, the nature of its fixed and variable expenses, the details of its debt obligations, or how much money it distributes to its principals.  Because the individual plaintiffs own both the Cloister Café and the building where the

---

[60]     Amended Cmplt. ¶ 141.

[61]     The limited information provided is available at Dkt. 43.

restaurant is located, it appears at the very least that they face no risk of missing rent payments.[62]

In addition, the limited information that the plaintiffs have provided about their revenue raises more questions than it answers.  According to the figures in one of the plaintiffs' declarations, the restaurant more than doubled its "monthly sales" per day for July and August 2020 versus July and August 2019.[63]  An individual named Christopher W. Young, whom the retained by the plaintiffs to analyze their finances, refers to this July and August 2020 as "the greatest two months of sales over the past many years" once adjusted for revenue per day.[64]  That the plaintiffs experienced such remarkable success during a pandemic that has devastated the restaurant industry is, to say the least, unusual.  The only explanation that the plaintiffs offer for their dramatically improved sales numbers is speculation by Mr. Young – who is neither a plaintiff nor an employee of the plaintiffs – that "[p]art of this July increase in revenue is most likely due to pent up demand for outdoor dining."[65]

Put simply, this speculation is unpersuasive.  Although the Court makes no findings on the actual cause of the Cloister Cafe's more than 100 percent increase in its revenue amidst the pandemic, the plaintiffs' failure to confront the SLA's allegations that the restaurant was earning

---

[62]

Dkt. 6 ¶ 1.

[63]

Taking into account that the Cloister Café reopened on July 11, 2020 and closed around midnight on August 7, 2020, its self-reported revenue numbers reveal that – despite the challenges of COVID-19 – the business took in $6,893.71 per day in July 2020 versus $2738.53 for July 2019, and $7,274 per day in August 2020 versus 3,107.74 for August 2019.  *See* Dkt. 43-1 at 2.

[64]

Dkt. 46 at 5.

[65]

*Id.*  Counsel for the plaintiffs offered the same theory when the Court raised this issue at oral argument.

18

revenue from prohibited activity impedes the Court's task of determining how much lawful revenue the business stands to lose if its liquor license remains suspended.[66]

In sum, while there is a significant private interest at stake, regardless of whether the Cloister Café can survive the license suspension, the Court cannot now conclude that requiring the plaintiffs to operate without a liquor license during the duration of any suspension would force the Cloister Café to shut down. That said, it would remain open to the plaintiffs in any further proceedings to seek to demonstrate the likelihood of such a result.

>    B.    *Government's Interest*

Next, the Court must examine the government's interest in suspending the plaintiffs' liquor license.

New York has compelling interests in protecting the health and safety of its citizens and in promoting its economy. Action to prevent the spread of the COVID-19, a deadly and highly contagious virus that has killed tens of thousands of New Yorkers and caused untold damage to New York's economy, falls squarely within the crosshairs of advancing these public interests. If a business is violating State law by using its liquor license to attract customers to mass gatherings that the State has good reason to believe will facilitate the spread of COVID-19, then the State has every

---

[66]

>    The Sheriff's Office's investigative report states, in reliance on what almost certainly is hearsay, that on August 7, 2020, patrons at the restaurant informed the investigators "that they made reservations between $300 for entry and $5,000 for a table." Dkt. 30-2 at 3. Again, the Court need not now take any position on what actually occurred, and it finds only that the plaintiffs' failure to explain the mystery surrounding the Cloister Café's increased revenue underscores the problem with their failure to provide more detailed financial information. If, for example, a significant amount of the revenue the Cloister Café stands to lose would have come from unlawful activity, there would be a strong argument that the loss of such revenue may not be credited under the *Mathews* test. In such a scenario, it would be unclear what baseline the Court should use for estimating lost revenue.

interest in putting a stop to this behavior.  Indeed, it should be applauded for doing so.

For these reasons, and based on the information they gathered, the Court finds that the defendants were justified in perceiving an immediate need to ensure that the plaintiffs stopped hosting what reasonably were viewed as dangerous mass gatherings.  The Court concludes likewise that the defendants had a reasonable basis for wishing to suspend the plaintiffs' liquor license as quickly as was possible consistent with the Constitution.[67]

That said, the defendants clearly could have provided the plaintiffs with at least some additional procedural safeguards.  Most obviously, it is difficult to see how the government would have been impeded by giving the plaintiffs advance notice of the summary suspension hearing, the opportunity to observe the hearing, which was held virtually, or the opportunity to submit a brief statement in response to the charges against them.[68]

---

[67]

This finding does not mean that the summary hearing, standing alone or in conjunction with the available post-deprivation remedies, comported with the requirements of due process. The Court turns to that issue momentarily.

[68]

Although the Court credits the State's interest in stopping the spread of COVID-19, it would be remiss if it overlooked the fact that the SLA's notice of pleading for its subsequently initiated revocation proceeding is concerned primarily with alleged infractions that have little or nothing to do with the pandemic or social distancing.  Most of the allegations concern building and fire code violations, such as an exit sign being obstructed by tree branches, a failure to maintain fire extinguisher servicing tags, and a curtain placed over an exit door.  Dkt. 11-1 at 1.  Only the first charge refers to one of the executive orders pertaining to social distancing (Executive Order 202.43) that are cited in the suspension order, and it does so via a vague reference to "violations of social distancing and open container laws and associated posted NYSLA and NYDOH Guidance within 100 feet from the licensed premises." *Id.*  While this language encompasses fairly the SLA's claims that individuals were violating open container, social distancing, and face covering requirements, it is a stretch to conclude that the charge accuses the plaintiffs of hosting a mass gathering.  Nonetheless, the State provided more detail in the suspension order, which is the cause of the injury giving rise to the plaintiffs' first procedural due process claim. And it is clear that the SLA's board reviewed significant evidence of a mass gathering at the Cloister Café and other social distancing violations before voting to suspend the

C.       *Risk of Erroneous Deprivation*

The remaining step of the *Mathews* framework requires the Court to assess the risk of erroneous deprivation of the plaintiffs' license under the procedures used by the SLA and to determine the probable value of any additional or substitute procedural safeguards.  Although the Court previously has described the process by which the SLA ordinarily is obligated to seek to revoke or suspend a license – which requires notice and a hearing – in this case it used its emergency power under Section 401, subd. 3, of SAPA.  Accordingly, the Court begins by examining those procedures before turning to the post-deprivation procedures that the SLA claims are available to plaintiff and render its summary action constitutional.

1.       *Pre-Deprivation Procedures*

As noted above, SAPA Section 401 allows the SLA (and other State agencies) to summarily suspend a license if it "finds that public health, safety, or welfare imperatively requires emergency action, and incorporates a finding to that effect in its order."[69]  When the SLA orders a suspension in a summary proceeding, it must institute and conclude promptly "proceedings for revocation or other action."[70]

In this case, the SLA met on the same day that the investigators visited the Cloister Café.  The plaintiffs were not given notice of this event or an opportunity to be heard.  At the

---

plaintiffs' license.  For these reasons – and despite the apparent flaws in the notice of pleading for the revocation proceeding  – the Court credits the State's interest as outlined above.

[69]       N.Y. ADMIN. PROC. ACT. § 401, subd. 3.

[70]       *Id.*

conclusion of the meeting, the SLA board members voted to suspend the plaintiffs' liquor license in the interest of public safety under Section 401, subd. 3.  Shortly thereafter, the SLA initiated revocation proceedings.

If this were all that occurred, there would be little question that the SLA violated the plaintiffs' due process rights.  A hearing without notice or an opportunity to be heard that results in the deprivation of what the Court assumes to be a protected property interest clearly does not comport with the minimum constitutional requirements.  But where pre-deprivation procedures like the summary hearing are constitutionally inadequate, "the existence of an adequate state remedy to redress property damage inflicted by state officers avoids the conclusion that there has been any constitutional deprivation of property without due process of law within the meaning of the Fourteenth Amendment."[71]  In particular, courts have upheld numerous types of summary suspensions as consistent with due process, especially when ordered in the interest of public safety, because an adequate post-suspension process was available.[72]  The Court turns now to the question of whether New York provides an adequate post-deprivation remedy to the plaintiffs.

---

[71] *Parratt v. Taylor*, 451 U.S. 527, 542 (1981) (quoting *Bonner v. Coughlin*, 517 F.2d 1311, 1319 (7th Cir. 1975)).

[72] *See, e.g.*, *Mackey v. Montrym*, 443 U.S. 1, 19 (1979) ("[T]he compelling interest in highway safety justifies the Commonwealth in making a summary suspension effective pending the outcome of the prompt postsuspension hearing available."); *Dixon v. Love*, 431 U.S. 105, 115 (1977) ("We conclude that the public interests present under the circumstances of this case are sufficiently visible and weighty for the State to make its summary initial decision effective without a predecision administrative hearing."); *Nnebe v. Daus*, 644 F.3d 147, 159 (2d Cir. 2011) ("[I]n the immediate aftermath of [a taxi driver's] arrest, when the [Taxi and Limousine Commission] has minimal information at its disposal and the very fact of an arrest is cause for concern, the government's interest in protecting the public [via a summarily issued suspension of the taxi driver's license] is greater than the driver's interest in an immediate hearing.").

### 2.     *Post-Deprivation Procedures*

#### i.     *Informal Reconsideration*

The SLA argues that two post-deprivation procedures are available to the plaintiffs. The first is what the SLA refers to as "the SLA Board's practice to allow parties to request reconsideration of summary suspensions."[73]

At oral argument, the defendants conceded that this process is not described anywhere in the SLA's rules or regulations. There is no evidence that this practice is made known to licensees generally or that licensees have a right to such a reconsideration. Nor is there evidence suggesting how that process works, such as whether licensees may cross-examine witnesses or offer evidence themselves. The Court therefore cannot conclude that such a process, apparently available at the sole discretion of the SLA and not grounded in positive law, is an adequate post-deprivation remedy. In fact, the SLA conceded at oral argument that this process is not constitutionally adequate, at least standing alone.

#### ii.     *The Revocation Proceeding*

The other post-deprivation process to which the SLA refers is the license revocation proceeding that the defendants initiated several days after the summary suspension. If the plaintiffs prevailed in the revocation proceeding, the SLA most likely – although the record is not entirely clear – would lift the summary suspension order. But that order would have been effective from August 7 until the revocation proceeding concludes, irrespective of the outcome and duration of that proceeding.

---

[73]     Dkt. 27 at 7.

The problem for the defendants is that they have provided little information about SLA revocation proceedings to the Court. The plaintiffs have made a threshold showing – notwithstanding the gaps in their filings outlined above – that having their liquor license suspended for a lengthy period of time would be detrimental to their business. Lengthy revocation proceedings likely could seriously prejudice the plaintiffs, and the defendants have not even contended that such a proceeding would remedy the harm caused by the summary suspension. In sum, the Court has significant doubts that the revocation proceeding would be constitutionally adequate in the circumstances of this case. But the Court need not reach this question because a different post-deprivation process is available to the plaintiffs.

### iii.    Article 78 Proceeding

Article 78 of the New York CPLR permits a plaintiff to challenge state administrative action.[74] In *Locurto v. Safir*,[75] which concerned the termination of two New York State public employees, the Second Circuit explained:

> "An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims. Petitioners proceeding under Article 78 may raise claims that the agency adjudicator was biased and prejudged the outcome, that the determination was slanted by the adjudicator's refusal to recuse herself, or that ex parte communications with other officials may have infected the adjudicator's ruling. . . . [A] judicial trial represents the epitome of full process."[76]

On this basis, *Locurto* held that "[a]n Article 78 proceeding . . . constitutes a wholly adequate post-

---

[74]

See, e.g., *Davis v. Halpern*, 813 F.2d 37, 38 n.1 (2d Cir. 1987).

[75]

264 F.3d 154 (2d Cir. 2001).

[76]

*Id.* at 174-75 (citations omitted).

deprivation hearing for due process purposes."[77]

For most of this litigation, the parties studiously avoided discussing whether the plaintiffs may challenge the summary suspension of their license in an Article 78 proceeding. They finally addressed the issue at the Court's invitation and submitted letters following oral argument. Because the parties accordingly have raised and briefed the issue, and because the Court is required by Second Circuit precedent to consider it,[78] the Court turns to the question of whether an Article 78 proceeding is available.

The SLA's organic statute, the ABC Law, states unambiguously that Article 78 proceedings are available whenever the SLA *suspends* a liquor license. Section 121, subd. 2, lists the "actions by the liquor authority shall be subject to review by the supreme court in the manner provided in article seventy-eight of the civil practice law and rules."[79] That list includes "[t]he revocation, cancellation or *suspension* of a license or permit by the liquor authority."[80] There is no

---

[77]

    *Id.* at 175.

    If an Article 78 proceeding were not available immediately, *Locurto* arguably could be distinguished from this case on the ground that requiring a plaintiff to wait until the conclusion of a lengthy administrative process could cause the license holder serious harm that would make any post-deprivation relief inadequate. The Court need and does not decide this question, however, because it determines that an Article 78 proceeding is available to the plaintiffs at this time.

[78]

    *See New York State Nat. Org. for Women v. Pataki*, 261 F.3d 156, 168 (2d Cir. 2001) ("[T]he district court erred in not considering Article 78 proceedings and how (if utilized by the claimants) these proceedings could have reduced claimants' risk of experiencing prejudicial delay.").

[79]

    N.Y. Alco. Bev. Cont. Law § 121, subd. 2.

[80]

    *Id.* (emphasis added).

exception for suspensions pursuant to the summary proceeding authorized by SAPA Section 401, subd. 3.  And nothing about those suspensions suggests that the word "suspension" in Section 121 does not apply to them.  They are suspensions like any other because they take immediate effect and stay in place until further notice.

Section 121, subd. 2, of the ABC Law is clear.  Yet, when prompted by the Court, the SLA largely ignored it, even though the immediate availability of an Article 78 proceeding to review the summary action likely would have secured the denial of the plaintiffs' motion.[81]  The reason that the SLA has been coy seems clear.  Notwithstanding the text of Section 121, the SLA repeatedly has argued in state court that Article 78 proceedings are *not* available to challenge its orders suspending a liquor license under SAPA Section 401.  In fact, the SLA persuaded two New York County trial courts to adopt its view.[82]  In both cases, the more reasoned of which is *Bracco's Clam & Oyster Bar Inc. v. New York State Liquor Authority*,[83] the SLA argued, and the courts held,

---

[81]

The SLA changed its position on this issue several times during this lawsuit.  In its above described letter, it stated that, "upon further consideration, the SLA agrees that its Orders of Summary Suspension of License, issued pursuant to [SAPA Section] 401, subd. 3, can be subject to judicial review in New York State Supreme Court pursuant to Article 78 of the N.Y. Civil Proc. Law and Rules."  Dkt. 50 at 1.  The phrase "can be" makes this statement essentially meaningless, because it leaves open the possibility that the SLA believes that in some and perhaps virtually all instances, such orders *may not be* reviewed in an Article 78 proceeding.  Nonetheless, the SLA's letter states next that it "further agrees" – the word "further" again suggesting that the SLA has not taken any meaningful position on the law – "that it will not raise as a defense or objection in point of law that [a New York State court in an Article 78 proceeding] lacks jurisdiction to review the August 7th Suspension Order on the grounds that it is a non-final order or otherwise."  *Id.*

[82]

*See Bracco's Clam & Oyster Bar Inc. V. N.Y. State Liquor Auth.*, 43 N.Y.S.3d 766, 2016 WL 4767427 (Sup. Ct. 2016); *Prime Six, Inc. v. N.Y. State Liquor Auth.*, No. 512697/2019, 2019 WL 5858084, at *2 (N.Y. Sup. Ct. Nov. 8, 2019).

[83]

43 N.Y.S.3d 766, 2016 WL 4767427 (Sup. Ct. 2016).

that "a summary suspension is not a final judgment" and therefore not reviewable under Article 78.[84]

This Court respectfully disagrees.  The SLA's previous argument and the decisions that adopted it rely on CPLR 7801, subd. 1, a generally applicable procedural rule stating that a party may not bring an Article 78 proceeding challenging a non-final agency determination.[85]  There is a long line of Court of Appeals decisions discussing what it means for an order to be final under this provision.  But rather than apply this authority, the SLA and *Bracco's Clam* looked to an Appellate Division decision in *150 RFT Varick Corp. v. New York State Liquor Authority*,[86] which involved neither Article 78 nor finality under CPLR 7801.  It considered instead whether a summary suspension order is "a final judgment" that "lacks preclusive effect" *for double jeopardy purposes*.[87] That issue is irrelevant to the question at hand.

According to the New York Court of Appeals, agency action is final for the purposes of Article 78 and CPLR 7801, subd. 1, where it "impose[s] an obligation, den[ies] a right[,] or fix[es] some legal relationship as a consummation of the administrative process."[88] Courts engaging in this analysis must look to "the completeness of the administrative action" and make "a pragmatic evaluation of whether the decisionmaker has arrived at a definitive position on the issue that inflicts

---

[84]

    *Id.* at *2.

[85]

    *Id.*

[86]

    986 N.Y.S.2d 102 (App. Div. 1st 2014).  Although *Bracco's Clam* cited to some of these Court of Appeals decisions, it did not apply the standard that they set forth.

[87]

    *Id.* at 103.

[88]

    *Essex Cty. v. Zagata*, 91 N.Y.2d 447, 453 (1998) (citation omitted).

an actual, concrete injury."[89]  If the agency action "causes petitioners actual, concrete injury and no further agency proceedings might alleviate or avoid the injury," it will be considered a final determination for [CPLR] 7801, subd. 1, purposes."[90]

Under this standard, the SLA's suspension order is final.  As noted many times now, the Section 401 proceeding has concluded and the suspension order is in effect.  The suspension itself is the cause of the "actual, concrete injury" that the plaintiffs claim to be suffering, which is that they may no longer use their liquor license.  Although the SLA may (or may not) lift the suspension order at the conclusion of the revocation proceedings, those proceedings will not "alleviate or avoid the injury" it presently is causing.[91]

*Bracco's Clam* does not ignore ABC Law Section 121, subd. 2.  But in this Court's view, it misconstrues the statute.  In concluding that Section 121 "does not permit [a court] to review a summary suspension," the court explained:

> "The statute states that the Supreme Court can review the [SLA's] *suspension* of a license.  Here, respondent has only *summarily suspended* petitioner's license and claims that there will be further proceedings regarding the license suspension."[92]

---

[89]

Id. (citation, quotation marks, and alteration omitted).

[90]

Id. at 454.

[91]

In fact, the reality that the suspension is affecting the plaintiffs right now is the reason that their claim is justiciable under Article III.  If the suspension were not "final" under CPLR 7801, subd. 1, which looks to whether the agency's "definitive position on the issue . . . inflicts an actual, concrete injury," the plaintiffs' claims arguably would be unripe.  This finding goes hand in hand with the New York Court of Appeals's observation that "the ripeness doctrine is closely related to the [CPLR 7801, subd. 1,] finality requirement, and in order for an administrative determination to be final, and thus justiciable, it must be ripe for judicial review."  *Ranco Sand & Stone Corp. v. Vecchio*, 27 N.Y.3d 92, 98 (2016).

[92]

*Bracco's Clam*, 43 N.Y.S.3d 766, 2016 WL 4767427, at *2.

SAPA Section 401 suspensions often are called "summary suspensions."  But as *Bracco's Clam* appears to recognize, the word "summary" refers to the nature of the *proceeding* that leads to the suspension order, rather than the nature of the order itself.[93]  A "*summarily suspended*" license is a suspended license.  And, as the SLA concedes, a summarily issued order of suspension takes immediate effect and remains in place indefinitely.  That plainly satisfies Section 121, which makes no reference to the manner in which a license was revoked, cancelled, or suspended.  It simply authorizes Article 78 proceedings challenging "[t]he revocation, cancellation or suspension of a license or permit by the [SLA]."[94]

Moreover, the SLA inadvertently may have misled the *Bracco's Clam* court insofar as it claimed that "there will be further proceedings regarding the license suspension."  It is true that Section 401 requires the commencement of a disciplinary proceeding when an agency suspends a license. But, as noted above, these are distinct proceedings, as evidenced by the fact that the agency is obliged by Section 401, subd. 3, to "institute[]" them promptly.[95]  And they are not *suspension*

---

[93]

See N.Y. ADMIN. PROC. ACT. § 401, subd. 1 ("When licensing is required by law to be preceded by notice and opportunity for hearing, the provisions of this chapter *concerning adjudicatory proceedings* apply."); *id.* § 401, subd. 2 (referring to "agency action . . . summarily suspending [a] license").

[94]

N.Y. ALCO. BEV. CONT. LAW § 121, subd. 2.

[95]

N.Y. ADMIN. PROC. ACT. § 401, subd. 3 ("These proceedings shall be promptly instituted and determined.").

Indeed, the order of suspension issued in this case makes clear that these are separate proceedings.  It states that the SLA suspended Cloister East's liquor license "until such time as this Order is lifted, or until a final Order becomes effective in connection with the disciplinary proceeding directed herein *to be commenced* by the [SLA]."  Dkt. 30-7 at 4-5 (emphasis added).

proceedings, but "proceedings for *revocation* or other action."[96]   Moreover, they may involve

charges that go beyond the stated basis of a suspension, as is true here.  The summary suspension

proceedings conclude when an agency issues an order of suspension.

      For all these reasons, it appears that the plaintiffs have a state-created right

immediately to bring an Article 78 proceeding challenging the suspension of their liquor license.[97]

      This view is confirmed by a plethora of decisions from the Appellate Division

involving different types of summary suspensions issued under SAPA Section 401, subd. 3.  In one

case involving New York's rules concerning the administration of drugs to race horses, the First

Department held that "[t]he State Administrative Procedure Act, Section 401[, subd. 3], expressly

permits a prehearing suspension in an emergency, and even then, such suspension may be

challenged in a CPLR Article 78 proceeding."[98]   At least five other Appellate Division decisions

have entertained and, in several instances, granted challenges on the merits to Section 401

suspensions, even when brought during the pendency of subsequent administrative proceedings.

Three of these cases involved the suspension of medical privileges,[99] one the suspension of a harness

---

[96]

    *Id.* (emphasis added).

[97]

    Article 78 specifically empowers state courts to stay any suspension under review.  N.Y. CPLR § 7805.

[98]

    *Equine Practitioners Ass'n, Inc. v. New York State Racing & Wagering Bd.*, 483 N.Y.S.2d 239, 243 (App. Div. 1st 1984), *aff'd as modified on different grounds*, 66 N.Y.2d 786 (1985).

[99]

    *See Corines v. Catholic Med. Ctr. of Brooklyn & Queens, Inc.*, 540 N.Y.S.2d 273, 273 (App. Div. 2d 1989) (affirming the dismissal of an Article 78 proceeding challenging a summarily issued suspension on the ground that the suspension was not arbitrary and capricious); *Murphy v. St. Agnes Hosp.*, 484 N.Y.S.2d 40, 42 (App. Div. 2d 1985) (affirming a lower court decision vacating a summarily issued suspension challenged under

racing license,[100] and one the suspension of a license to practice veterinary medicine at racetracks.[101] There is no apparent reason that the suspension of a liquor license under the same procedural statute should be treated any differently than the many types of suspensions at issue in these cases – particularly in light of the clear mandate of ABC Law Section 121.[102]

        At least three district courts in this circuit applying New York law reached the same conclusion. They dismissed procedural due process claims in part because of the immediate availability of Article 78 proceedings to challenge a summary suspension.[103] These cases involved

---

Article 78); *John P. v. Axelrod*, 468 N.Y.S.2d 951, 953 (App. Div. 4th 1983) (declining to vacate a summarily issued suspension of the petitioner's medical license challenged through an Article 78 proceeding on the ground that it was neither arbitrary and capricious nor overbroad), *aff'd*, 61 N.Y.2d 891 (1984) (affirming the summarily issued suspension order because "the commissioner was justified in concluding, in the circumstances of this case, that petitioner's practice posed an imminent danger to the public health").

[100]

*See Marohn v. Van Lindt*, 473 N.Y.S.2d 560, 561 (App. Div. 2d 1984) (reversing a lower court's decision to vacate a summarily issued suspension of a license in an Article 78 proceeding because the suspension was justified on public safety grounds).

[101]

*See Gerard v. Barry*, 453 N.Y.S.2d 374, 375 (App. Div. 2d 1977) (affirming where a lower court vacated a summarily issued suspension challenged via Article 78 on the ground that the defendant had not made any findings regarding public health or safety).

[102]

It is not lost on the Court that several of these discussions involved the horse racing industry. This appears to be nothing more than a coincidence. The licenses at issue are different, none of the cases turns on anything particular to the horse racing industry, and the cases do not cite to or rely on each other. That said, New York courts may have a particular affinity for horse racing in this area of the law. A Court of Appeals decision concerning the legality of a summary revocation involved a jockey license. *See Saumell v. New York Racing Ass'n, Inc.*, 58 N.Y.2d 231, 235 (1983).

[103]

Some of these decisions relied also on the availability of other administrative proceedings.

the suspension of a New York City employee,[104] the suspension of a taxi driver's license,[105] and the suspension of a medical license.[106]

### D.   Conclusion

Because the plaintiffs may challenge immediately the suspension of their liquor license in an Article 78 proceeding, the Court concludes that an adequate post-deprivation hearing is available to them.[107]  This holding ensures that the plaintiffs' procedural due process rights have

---

[104]

      *Raja v. Burns*, No. 19-cv-01328, 2019 WL 1118044, at *4 (E.D.N.Y. Mar. 11, 2019) (denying preliminary relief and finding for the government on the second *Mathews* factor because "[p]laintiff is offered significant post-suspension process.  He is entitled to not only an Article 78 hearing, but also an administrative process, the details of which are not fully known at this early point but will include the opportunity to provide a written response and evidence on his behalf within 14 days of his suspension taking effect, and a proceeding of some kind.").

[105]

      *Nnebe v. Daus*, No. 06-cv-4991 (KMK), 2006 WL 2309588, at *5 (S.D.N.Y. Aug. 7, 2006) (denying preliminary relief because, among other reasons, "the next procedural step available to Plaintiff is to appeal the Chairperson's decision to the [Taxi and Limousine Commission] Commissioners.   In the alternative, Plaintiff could file an Article 78 proceeding in the state court pursuant to N.Y. CPLR § 7803.  Courts have required plaintiffs to avail themselves of state proceedings before bringing a federal action.").

[106]

      *See DiBlasio v. Novello*, No. 01-cv-4498 (WHP), 2002 WL 31190139, at *7 (S.D.N.Y. Sept. 30, 2002), *vacated*, 344 F.3d 292 (2d Cir. 2003).  On appeal, the Second Circuit, in the context of assessing whether a state medical commissioner was absolutely immune from suit, found that "Article 78 proceedings are generally not considered adequate avenues for 'appeal.'"  *DiBlasio v. Novello*, 344 F.3d 292, 299 (2d Cir. 2003).  It did not, however, address the district court's finding that Article 78 is available for review of Section 401, subd. 3, suspensions.

[107]

      *See Locurto*, 264 F.3d at 174-75.

not been violated – at least not yet.[108]  And it is particularly resonant here because of the State's

compelling interest in protecting the public from the dangers of COVID-19.[109]

        The availability of an adequate post-deprivation proceeding under state law thus

swings the balance of the *Mathews* test in favor of the government.  The plaintiffs therefore have

---

[108]

    In a letter addressed to the Court, the plaintiffs argue for several reasons that an Article 78 proceeding would not ensure that their due process rights are protected.  *See* Dkt. 51. Among other arguments already addressed, they argue that there is no guarantee that the Article 78 court would hold a prompt hearing and that they would be limited in an Article 78 proceeding to the administrative record and could not take discovery.

    First, and as noted above, the Second Circuit held in *Locurto* that, at least as a general matter, "[a]n Article 78 proceeding . . . constitutes a wholly adequate post-deprivation hearing for due process purposes."  264 F.3d at 175.  Because the plaintiffs' objections are made generally to Article 78 proceedings, this is controlling.

    Next, although the plaintiffs are not guaranteed a prompt hearing under Article 78, this argument misses the point.  An Article 78 proceeding may be commenced by order to show cause instead of notice of petition.  The matter is resolved as fast as the presiding justice thinks it should be, which is exactly the same situation that the plaintiffs face here in federal court, where there is no statutory guarantee of an immediate hearing when a party moves for a TRO or preliminary relief.

    The plaintiffs' argument based on an Article 78 proceeding being limited to the administrative record and the lack of available discovery is similarly unpersuasive.  The plaintiffs' principal claim before this Court is that their procedural due process rights were violated by the lack of pre-deprivation notice and an opportunity to be heard.  That issue can be raised in an Article 78 proceeding without an administrative record and without discovery.  If the plaintiffs prevailed, the suspension order would be lifted without regard to whether it was arbitrary and capricious.

[109]

    *Cf., e.g.*, *Mackey*, 443 U.S. at 19 ("[T]he compelling interest in highway safety justifies the Commonwealth in making a summary suspension effective pending the outcome of the prompt postsuspension hearing available."); *Dixon*, 431 U.S. at 115; *Nnebe v. Das*, 644 F.3d 147, 159-63 (2d Cir. 2011) (holding, where the defendants summarily suspended that taxi drivers' licenses without a hearing upon their arrest for a felony or certain misdemeanors, that although the drivers had an "enormous" private interest, the "strong government interest" in protecting the public "in the short term, prior to any hearing" was "greater than the [plaintiffs'] interest in an immediate [and procedurally adequate] hearing," and that "insofar as the post-suspension hearing affords adequate process, no pre-suspension hearing is required").

not met their burden of showing a likelihood of success on the merits of their first procedural due process claim or that there are sufficiently serious merits questions warranting immediate relief.[110] For this reason, the Court need not now consider whether the plaintiffs are threatened with immediate and irreparable injury with respect to this claim.

## II.     *Procedural Due Process Claim – Revocation Proceeding*

To the extent that it differs from the first claim, the plaintiffs' second claim alleges a procedural due process violation by the SLA on the ground that: "Prior to any administrative hearing and having heard no evidence, the Chairman of the Board has openly recommended that Plaintiffs shall not be returned their License on a permanent basis."[111]  This claim is unlikely to succeed on the merits for several reasons.

First, it appears that this claim is not ripe for adjudication.  It concerns an ongoing license revocation proceeding that has not resulted in any alleged injury to the plaintiff such as a revocation order.  In fact, the plaintiffs acknowledge in their complaint that the comments at issue were made "[p]rior to any administrative hearing" and during a time when (in their view) the SLA had "heard no evidence."  The plaintiffs could prevail in the revocation proceeding, in which case their license would not be revoked and they would not have suffered any deprivation as a result of that proceeding.  "A claim is not ripe if it depends upon 'contingent future events that may not occur

---

[110]

The SLA's brief devotes considerable attention to an argument that the plaintiffs have not shown a likelihood of success on the merits because the Court is required to dismiss this action under the doctrine of *Younger* abstention.  Because the grounds considered above resolve the motion for a preliminary injunction, the Court declines to reach this issue.

[111]

Amended Cmplt. ¶ 146.

as anticipated, or indeed may not occur at all.'"[112]

Second, the claim likely would fail under Rule 12(b)(6).  The plaintiffs have not alleged, as they must to state a procedural due process claim, that they suffered an unlawful deprivation as a result of the statement by the SLA board member.  To the extent they rely on the suspension of their license, that argument has been addressed already.

Finally, and for the reasons outlined in Part I of this opinion, any injury that the plaintiffs have suffered or may suffer in the revocation proceeding, if it does not comport with the requirements of procedural due process, could be remedied by an Article 78 proceeding.

III.    *Equal Protection Claim*

The plaintiffs' final claim is for an equal protection violation.  Its premise is that the defendants, during the summary suspension proceeding, "reli[ed] on a third-party publication [the Gothamist article] over facts that should have been corroborated or undermined by means of its own investigation and the failure to conduct a proper investigation," and they thereby caused the plaintiffs to be "treated arbitrarily unequally in comparison with those establishments given fair hearings based on admissible evidence."[113]  The alleged injury that the plaintiffs suffered as a result of this conduct was the suspension of their license.

"The Equal Protection Clause requires that the government treat all similarly situated people alike."[114]  Ordinarily, equal protection claims are raised by those who allege that they were

---

[112]
        *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013).

[113]
        Amended Cmplt. ¶ 154.

[114]
        *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

treated differently because of their membership in a protected class. But even where a plaintiff does not make such an allegation, it can proceed with a "class of one" claim. "A class-of-one claim exists 'where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'"[115] On such a claim, a plaintiff must show that:

> "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake."[116]

The plaintiffs have not alleged that they are members of a protected class or any particular class. Rather, they allege that they were "treated arbitrarily unequally in comparison with those establishments given fair hearings based on admissible evidence."[117] Accordingly, the Court construes their equal protection claim as a class of one claim.

At the outset, the Court observes that the record contradicts the factual premise of this claim. The SLA conducted an investigation when it gathered evidence and visited the Cloister Café on August 7, 2020. It presented at least some of this evidence to the SLA board at the summary suspension hearing. The Gothamist article was among that evidence, but there is no basis in the record for concluding that the SLA board relied exclusively on its contents or ignored the other evidence.

---

[115]

    *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

[116]

    *Id.* (quoting *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005)).

[117]

    Amended Cmplt. ¶ 154.

Even taking the plaintiffs' allegations as true, however, they have failed to show a likelihood of success on the merits under the class of one standard.  They have presented no evidence that any entity, similarly situated or otherwise, was treated differently by the SLA in a comparable summary suspension proceeding.  Their filings refer to only one other case where they alleged that a similarly situated party was treated differently.[118]  In that case, a licence holder had its suspension lifted after it availed itself of the SLA's informal reconsideration process – a process that the plaintiffs thus far have chosen not to use.[119]  There is simply no basis on this record for concluding – and the plaintiffs do not allege otherwise – that these two entities were situated similarly, and the facts described the plaintiffs make clear that they were not.  Beyond this citation, the plaintiffs' reference to unidentified entities "given fair hearings" is conclusory.

The Court does not mean to discount the plaintiffs' belief that they were treated unfairly.  But on this record, the most plausible inference is that the SLA acted rationally by suspending the plaintiffs' liquor license in the interest of public safety when it possessed a not insubstantial amount of information that the plaintiffs were engaging in conduct that posed an imminent threat to the health and safety of New Yorkers.  There is no evidence of which the Court is aware that the SLA singled out the plaintiffs or that any differential treatment was anything other than a mistake.

---

[118]
The plaintiffs brought this case to the Court's attention only by reference to the Frering declaration, where it is discussed for a different purpose.  The plaintiffs add no new information about the case that might be relevant to their equal protection claim.

[119]
*See* Dkt. 38 at 8 (citing Dkt. 30 ¶ 30).

*Conclusion*

The Court has considered the plaintiffs' remaining arguments and finds that they are without merit.  The motion for a preliminary injunction is denied.  This ruling, however, is without prejudice to renewal if any Article 78 proceeding they may institute does not result in disposition on the merits of their claim that the summary suspension order was unconstitutional.

The foregoing are the Court's findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a)(2).

SO ORDERED.

Dated:          September 2, 2020

_____
Lewis A. Kaplan
United States District Judge