UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE CLOISTER EAST, INC., et al.,

                   Plaintiff,

         -against-                            20-cv-6545 (LAK)

NEW YORK STATE LIQUOR AUTHORITY, et al.,

                   Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/28/21
```

## MEMORANDUM OPINION

Appearances:

        Robert Garson
        Kevin Kehrli
        Jacob Pargament
        GARSON, SEGAL, STEINMETZ, FLADGATE LLP
        *Attorneys for Plaintiffs*

        James B. Cooney
        Benjamin D. Liebowitz
        Matthew L. Conrad
        Assistant Attorney General
        LETITA JAMES
        ATTORNEY GENERAL OF THE STATE OF NEW YORK
        *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

        Life in New York changed dramatically in March 2020 when the Governor of New York declared a state of emergency due to the COVID-19 pandemic.[1]  Almost immediately, movie

---

[1]   N.Y. Exec. Order No. 202.

2

theaters, gyms, and other venues were directed to shut down.  Restaurant and bars were permitted to serve food for off-site consumption only.[2]

For many months thereafter, New York struggled to stem the spread of the COVID-19 virus.  From February 29 to June 1, 2020, more than 200,000 cases of COVID-19 were reported in New York City alone, resulting in more than 18,000 deaths.[3]   The pandemic brought unprecedented challenges also to those lucky enough to stay healthy. From February to April 2020, nearly two million New Yorkers lost their jobs.[4]  And all New Yorkers had to contend with many months of "lockdown" and the isolation and uncertainty that ensued.

As the summer approached, New Yorkers understandably were eager to return to some semblance of normal life and commerce.  Nonetheless, a state of emergency remained in effect, and reopening occurred in cautious phases.  To that end, the Governor issued an executive order on June 6, 2020 allowing restaurants and bars to serve food and beverages only outdoors and in compliance with guidelines promulgated by the New York Department of Health (the "DOH").[5]

---

[2]

N.Y. Exec. Order No. 202.3.

[3]

Corinne N. Thompson, Jennifer Baumgartner, et al., *COVID-19 Outbreak — New York City, February 29–June 1, 2020, Morbidity and Mortality Weekly Report 2020; 69:1725–1729*, U.S. CENTER FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/mmwr/volumes/69/wr/mm6946a2.htm?s_cid=mm6946a2_w (last visited Sept. 22, 2021).

[4]

*New York's Economy and Finances in the COVID-19 Era*, OFFICE OF THE COMPTROLLER, https://www.osc.state.ny.us/reports/new-yorks-economy-and-finances-covid-19-era-march-30-2021 (last visited Sept. 9, 2021).

[5]

N.Y. Exec. Order No. 202.38.

This case involves one particular effort by the New York State Liquor Authority's (the "SLA") efforts to enforce those guidelines. Plaintiffs – The Cloister East, Inc., which operates a restaurant known as Cloister Café, and its owners – claim that the SLA improperly suspended their liquor license after an article published on the *Gothamist.com* reported that Cloister Café was hosting illegal "pandemic parties." They seek damages, declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 based on alleged violation of their constitutional rights by the SLA and various of its officers and employees.

### *Background*

*I.    Executive Orders and DOH Guidance*

Executive Order 202.38, issued on June 6, 2020, allowed a restaurant or bar to serve patrons "on-premise only in outside space, provided such restaurant or bar is in compliance with Department of Health guidance promulgated for such activity."[6] The applicable DOH guidance (the "DOH Guidance") defined "outdoor spaces" as "open-air space designated for the consumption of food and/or beverage," which may have a "temporary or fixed cover" if the "cover has at least two sides open for airflow."[7] The guidelines did not set occupancy limits for outdoor spaces. However, they directed that "[t]o minimize further spread, social distancing of at least six

---

[6]    *Id.*

[7]    *Interim Guidelines for Outdoor and Take-out/Delivery Food Services During the COVID-19 Public Health Emergency*, NEW YORK STATE DEPARTMENT OF HEALTH, https://www.governor.ny.gov/sites/default/files/atoms/files/OutdoorTakeoutDeliveryFoodServicesMasterGuidance.pdf (last visited Sept. 22, 2021) at 3.

feet must be maintained between individuals, where possible."[8]  To that end, the guidelines required that "outdoor capacity [must be] limited to the number of tables that can be safely and appropriately arranged such that each table is a minimum of six feet away from another."[9]  It mandated also that tables be limited to 10 patrons each and that "individuals seated at a table [] be members of the same party."[10]

The Governor subsequently issued Executive Order 202.43, which, in order to "prevent[ed] the unnecessary congregation of people to slow the spread of [COVID-19]," provided that restaurants and bars were required to ensure that the social distancing and face covering requirements set forth in the DOH Guidance were followed by all persons within 100 feet of the premises.[11]  If these requirements were not adhered to, the restaurant or bar was required to cease serving alcoholic beverages.[12]

Finally, Executive Order 202.52 directed restaurants and bars to serve alcoholic beverages only if accompanied by food items.[13]  It emphasized also that while New York State had succeeded in lowering the COVID-19 infection rate through the state's careful approach to

---

[8]     *Id.* at 1.

[9]     *Id.* at 3.

[10]    *Id.* at 4.

[11]    N.Y. Exec. Order No. 202.43.

[12]    *Id.*

[13]    N.Y. Exec. Order No. 202.52.

reopening, it was "incumbent" upon "business owners and local governments" to continue to "enforce public health requirements to allow [the] safe reopening to continue."[14]

II.    *The SLA's Authority and Procedures*

   The SLA is an agency of the State of New York that is responsible for administering the New York State Alcohol Beverage Control Law.  The SLA may suspend, cancel, or revoke a liquor license "for cause."[15]  "Cause" includes "the existence of a sustained and continuing pattern of noise, disturbance, misconduct, or disorder on or about the licensed premises, related to the operation of the premises or the conduct of its patrons, which adversely affects the health, welfare or safety of the inhabitants of the area in which such licensed premises are located."[16]

   Generally, it may suspend, cancel, or revoke a license only "after a hearing at which the licensee shall be given an opportunity to be heard."[17]  However, Section 401, subd. 3, of the New York State Administrative Procedure Act ("SAPA") allows state agencies – including the SLA – to order the summary suspension of a license if it "finds that public health, safety, or welfare

---

[14]
  *Id.*

[15]
  N.Y. Alco. Bev. Cont. Law § 118.

[16]
  *Id.* at § 118(3).

[17]
  *Id.* at § 119(2).

A more detailed discussion of these provisions is set forth in the Court's prior decision denying plaintiffs' motion for injunctive relief.  *See Cloister E., Inc. v. New York State Liquor Auth.*, 483 F. Supp. 3d 221, 227-9 (S.D.N.Y. 2020).

imperatively requires emergency action."[18]  In such cases, the SLA is not required by statute to provide notice or an opportunity to be heard before ordering a summary suspension.  Instead, a summary suspension order takes effect "pending proceedings for revocation or other action," which "shall be promptly instituted and determined."[19]

### III.    The Events of August 2020

On August 4, 2020, the *Gothamist.com,* an online outlet, published an article that claimed that Cloister Café was hosting "illegal, illicit pandemic parties."[20]  Allegedly prompted by that article, Officer Charles R. Stravalle – an investigator for the SLA – visited the restaurant at around midnight on August 7, 2020.[21]  According to the amended complaint, Stravalle inspected the operation and spoke with Cloister Café's owner "on several topics, none relating to COVID-19 enforcement."[22]  The amended complaint does not describe Stravalle's investigation in detail aside from alleging that he mistook a canvas covering above a patio area as a ceiling and "failed to notice" that there were only two walls enclosing that space.[23]  Plaintiffs assert that Stravalle failed to conduct

---

[18]

N.Y. S.A.P.A. § 401.

[19]

*Id.*

[20]

Amended Complaint [Dkt. 16] (hereinafter "Am. Compl.") at ¶ 39.

[21]

*Id.* at ¶¶ 40, 42.

[22]

*Id.* at ¶¶ 42, 44.

[23]

*Id.* at ¶ 43.

a proper investigation and caused an erroneous report to be submitted to the board of the SLA (the "SLA Board").[24]

Later on that same night, the SLA Board met by video-conference to vote on whether to suspended Cloister Cafe's liquor license.[25]   Plaintiffs were not notified of this meeting and accordingly were not provided an opportunity to be heard.[26]

At that meeting, Margarita Marsico – associate counsel for the SLA – allegedly presented incorrect and misleading information to the SLA Board.   According to the amended complaint, Marsico described Cloister Café's outdoor area as a "secret backyard," despite the fact that Cloister Café had been "legally permitted" to serve food in that area for many years.[27]   In particular, plaintiffs allege that Marsico told the SLA Board that there was "an illegal structure that was really three walls of neighboring buildings with a ceiling on top."[28]   They allege that this statement was misleading because Marsico failed to explain that the ceiling was actually a "cloth awning," that there were "only two walls of neighboring buildings," and that the "temporary

---

[24]   *Id.* at ¶¶ 88-91.

[25]   *Id.* at ¶ 46.

[26]   *Id.*

[27]   *Id.* at ¶¶ 57-58.

[28]   *Id.* at ¶ 61.

enclosure [had been] approved by the Department of Buildings and that the space is deemed to be an outdoor space."[29]

Plaintiffs allege also that Marsico incorrectly informed the SLA Board that the maximum capacity at Cloister Café was "half of seventy-four" and that it was "way over occupancy."[30]  They allege that Marsico "failed to inform the Board that the amount of people present in the Cloister Café was within the parameters of permitted occupancy."[31]  Likewise, they allege that Gary Meyerhoff, the SLA's general counsel, "made incorrect assertions of fact and law to the Board that there were seventy (70) people 'inside' and the presence of patrons at Cloister Café was illegal."[32]  Plaintiffs allege also that Marsico told the SLA Board that there was a live DJ on the premises and that the receipts for food items appeared suspicious, suggesting that Cloister Café had been serving alcohol without any food, contrary to Executive Order 202.52.[33]

Finally, plaintiffs allege that Marsico improperly relied on the *Gothamist.com* article and provided it to the SLA Board.[34]  They further contend that the SLA Board improperly relied on

---

[29]     *Id.* at ¶¶ 62-65.

[30]     *Id.* at ¶ 79.

[31]     *Id.* at ¶ 80.

[32]     *Id.* at ¶ 66.

[33]     *Id.* at ¶¶ 71, 73, 86.

[34]     *Id.* at ¶¶ 92-93.

9

the *Gothamist.com* article despite being "well aware" that the article was more prejudicial than it was probative.[35]

Based on the information provided by Marsico and Meyerhoff, the SLA Board voted to issue an emergency order suspending Cloister Cafe's liquor license pursuant to Section 401(3) of the SAPA (the "Suspension Order").[36]  In the Suspension Order, the SLA Board explained that it had been provided with evidence that patrons were observed inside Cloister Café and in a backyard area within an enclosure made of three walls and a fabric roof.[37]  It stated also that evidence had been presented that patrons were observed drinking alcohol and "mingling amongst each other."[38]  Based on those reports, it stated that the SLA Board had concluded that plaintiffs were violating one or more executive orders, which "creates a serious and continuing risk to the health, safety and welfare of the public."[39]  It therefore concluded that it was "imperative that emergency action be taken against the immediate and continuing danger" resulting from plaintiffs' conduct.[40]  According to the Suspension Order, that decision was voted on by the chairman of the SLA, Vincent Bradley, and

---

[35]

*Id.* at ¶¶ 94, 103, 105.

[36]

*Id.* at ¶ 120.

[37]

Dkt. 30-7 at ¶ 6.

[38]

*Id.* at ¶ 7.

[39]

*Id.* at ¶¶ 8-9.

[40]

*Id.* at ¶ 10.

10

SLA commissioners Lily Fan and Greeley Ford.[41]  In addition to voting for the summary suspension,

Chairman Bradley allegedly stated that "he would recommend that Cloister Café should not get its

license back permanently without any hearing."[42]

Shortly thereafter, as required by Section 401(3) of the SAPA,[43] the SLA served

plaintiffs with notice of an administrative proceeding to revoke or cancel Cloister Café's liquor

license (the "Notice of Pleading").[44]  Among other charges, the Notice of Pleading claimed that

plaintiffs had violated Executive Order 202.43[45] which, as discussed above, required restaurants

to ensure compliance with applicable DOH Guidance within 100 feet of the premise.[46]


## IV.    Prior Proceedings

Following these events, plaintiffs brought this action against the SLA and SLA officers

and employees Stravalle, Marsico, Meyerhoff, Bradley, Fan,  Ford, and Donohue (collectively the

---

41

    *Id.* at 2, 5.

42

    Am. Compl. at ¶ 108.

43

    N.Y. S.A.P.A. § 401(3)(requiring that the SLA "promptly" initiate "proceedings for
revocation or other action" following a summary suspension).

44

    Dkt. 30-8.

45

    *Id.* at 1.

46

    Executive Order 202.43 at 2.

    Plaintiffs claim that the Notice of Pleading, unlike the Suspension Order, did not charge
Cloister Café with operating an enclosed structure or serving alcohol without food.
Am. Compl. at ¶¶ 111-2, 121.  However, as noted, the Notice of Pleading's first charge
encompasses violations of the DOH Guidance.

"Individual Defendants") in their individual capacities.  The amended complaint asserts three claims:
First, plaintiffs allege that the failure to provide a hearing before issuing the Suspension Order
violated their right to procedural due process.[47]  Second, they contend that the revocation hearing
violated their right to procedural due process because Chairman Bradley recommended permanently
revoking Cloister Café's liquor license even before the revocation proceeding began.[48] Finally, they
claim that they were denied equal protection of the laws because the SLA Board unfairly considered
a "third-party publication" – i.e., the *Gothamist.com* article – in deciding to suspend Cloister Café's
liquor license.[49]

Plaintiffs moved for a temporary restraining order ("TRO") and a preliminary
injunction barring enforcement of the Suspension Order.  In so doing -- and evidently aware of the
fact that a procedural due process claim based on predeprivation lack of notice and an opportunity
to be heard may fail where the state affords a prompt and effective post-deprivation remedy –
plaintiffs asserted that there was no such remedy for summary suspension of their liquor license.
This, they argued, was attributable to the fact that the SLA "routinely seeks to insulate itself from
Article 78 review" of such suspensions in the New York courts by contending that summary
suspensions are not final agency actions under SAPA and that it has been successful in doing so.[50]
While this Court denied the plaintiffs' application for a TRO, it noted that:

---

[47]
     *Id*. at ¶ 138.

[48]
     *Id*. at ¶ 146.

[49]
     *Id*. at ¶ 154.

[50]
     Dkt. 5, at 20-21.

> "It ill behooves the SLA to argue in this Court that prompt and effective review of summary suspension orders may be had in Article 78 proceedings in state court while repeatedly arguing just the opposite in state courts. Moreover, the fact that it has prevailed on this issue in some state courts raises a serious question as to whether there is any prompt and effective state court remedy."[51]

The defendants' response with respect to this issue was more significant for what it did not say than for what it did. To be sure, it argued that the due process claim should fail because there were adequate post-deprivation remedies. But those supposedly adequate remedies all were within the SLA: some formally available, some allegedly available on an informal basis to those who know enough to ask, and none available by means of judicial review.[52] And the defendants were entirely silent with respect to plaintiffs' showing that the SLA repeatedly has taken the position, some times successfully, that summary suspensions are not reviewable in the state courts.[53]

Some days later, defendants – perhaps sensing the quarter from which wind was blowing – finally engaged with the fact that the SLA's position with respect to review via state court Article 78 proceedings of summary license suspensions might be a serious problem for them – changed their position. In a letter to the Court, it stated that "upon further consideration" that it "agree[d] that its Orders of Summary Suspension of License, issued pursuant to [SAPA Section] 401(3), can be subject to judicial review in New York State Supreme Court pursuant to Article 78 of the N.Y. Civil Proc. Law and Rules."[54] However, as the Court noted previously, "[t]he phrase 'can

---

[51]      Dkt. 15, at 6 (footnote omitted).

[52]      Dkt 27, at 18-23.

[53]      Dkt. 27 *passim.*

[54]      Dkt. 50 at 1.

be' [made] this statement essentially meaningless, because it [left] open the possibility that the SLA believes that in some and perhaps virtually all instances, such orders may not be reviewed in an Article 78 proceeding."[55]

The SLA told the Court also that it "further agree[d]" that "it [would] not raise as a defense or objection in point of law that [a New York State court in an Article 78 proceeding] lacks jurisdiction to review the August 7th Suspension Order on the grounds that it is a non-final order or otherwise."[56]  As the Court noted at the time, "the word 'further' again suggest[ed] that the SLA has not taken any meaningful position on the law."[57]

Nonetheless, based on the SLA's representations, the Court denied plaintiffs' motion for injunctive relief because, among other reasons, it concluded that an adequate post-deprivation hearing would be available to plaintiffs in the form of an Article 78 proceeding.[58]  That denial, however, was without prejudice to renewal if plaintiffs ultimately were unable to obtain judicial review of the Suspension Order in an Article 78 proceeding.[59]

---

[55] *Cloister E.*, 483 F. Supp. 3d at 238 n. 81.

[56] Dkt. 50 at 1.

[57] *Cloister E.*, 483 F. Supp. 3d at 238 n. 81.

[58] *Cloister E.*, 483 F. Supp. 3d at 241-43.

[59] *Id.* at 244.

14

Following that decision, plaintiffs filed an Article 78 petition before Justice Engoron in New York State Supreme Court.[60]  On September 11, 2020, Justice Engoron issued a TRO vacating the Suspension Order pending a hearing on the Article 78 petition.[61]  Subsequently, the SLA voted to rescind the Suspension Order.  Accordingly, Justice Engoron determined that the Article 78 proceeding was moot and denied plaintiffs' Article 78 petition.[62]

Having thus defeated plaintiffs' attempt to obtain judicial review of the Suspension Order, the SLA began the administrative hearing on the its petition to revoke or cancel Cloister Café's liquor license shortly thereafter.  On December 1, 2020, the administrative law judge ("ALJ") sustained 16 of the SLA's charges, including charges related to COVID-19 and other safety violations.[63]  Following that decision, the SLA board voted to adopt the ALJ's findings and canceled Cloister Café's liquor license.

On February 18, 2021, plaintiffs filed a second Article 78 petition in New York State Supreme Court challenging the SLA's cancellation of Cloister Café's liquor license.[64]   On

---

[60]

Declaration of Matthew L. Conrad [Dkt. 67] (hereinafter "Conrad Decl."), Ex. H; *In re The Cloister East, Inc.*, Index No. 157157/2020 (N.Y. Sup. Ct.), Doc No. 1.

[61]

*Id.* at Doc No. 38.

[62]

*Id.* at Doc No. 72.

[63]

Conrad Decl., Ex. L at 26-29.

The ALJ concluded also that Cloister Café failed to disclose in its licensing form that it was legally dissolved in 1993 due to an outstanding warrant for approximately $144,000 in unpaid taxes. *Id.* at 34-35.

[64]

*In re The Cloister East, Inc.*, Index No. 151728/2021 (N.Y. Sup. Ct.), Doc No. 1.

March 4, 2021, the state court temporarily vacated the cancellation order pending the Article 78 hearing.[65]  However, on April 19, 2021, the court dismissed the Article 78 petition on the ground that Cloister Café had been administratively dissolved in 1993 for failing to pay taxes and thus lacked legal capacity to sue.[66]  That decision also rescinded the prior order temporarily vacating the cancellation of Cloister Café's liquor license.[67]  Plaintiffs subsequently filed a notice of appeal from that decision and moved to renew their Article 78 petition on the grounds that Cloister Café has paid its outstanding tax liability and been reinstated.[68]  That application remains pending.

Defendants now move to dismiss the claims against them.  First, the SLA argues that plaintiffs claims against it are barred by the Eleventh Amendment.  Second, the Individual Defendants contend that the amended complaint fails to state a sufficient claim against them and that they are entitled to dismissal based on qualified immunity for any allegedly unlawful conduct.  For the reasons discussed below, defendants' motion is granted albeit with leave to replead.

---

[65]   *Id.*, Doc No. 55.

[66]   *Id.*, Doc No. 71.

[67]   *Id.*

[68]   *Id.*, Doc. Nos. 73, 105.

*Discussion*

I.   *Claims Against the SLA – Sovereign Immunity*

The Eleventh Amendment bars the Court from entertaining a "suit brought by a citizen against his own State."[69] This "assertion of sovereign immunity implicates jurisdictional concerns."[70] Accordingly, "whether or not sovereign immunity bars a claim is properly decided under a Rule 12(b)(1) motion."[71]

"A party seeking to invoke the subject matter jurisdiction of a Court has the burden of demonstrating that there is subject matter jurisdiction in the case."[72]  In deciding whether there is jurisdiction over a claim, the Court "must accept as true all material factual allegations in the complaint, but [does] not . . . draw inferences from the complaint favorable to plaintiffs."[73] The court may also look to evidence outside of the pleadings to determine whether there is jurisdiction.[74]

Here, plaintiffs do not dispute that the Eleventh Amendment applies to claims against state agencies such as the SLA.[75] They argue, however, that the SLA waived its sovereign immunity and,

---

[69]   *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984).

[70]   *Hale v. Mann*, 219 F.3d 61, 67 (2d Cir. 2000).

[71]   *Goonewardena v. New York*, 475 F. Supp. 2d 310, 321 (S.D.N.Y. 2007).

[72]   *Shenandoah v. Halbritter*, 366 F.3d 89, 91 (2d Cir. 2004).

[73]   *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004).

[74]   *Id.*

[75]   *See Tessler v. Paterson*, 768 F. Supp. 2d 661, 672 (S.D.N.Y. 2011) (The Eleventh Amendment bars claims against the Division of Alcoholic Beverage Control, a/k/a the New

in any case, that their claim for injunctive relief is not barred by the Eleventh Amendment by virtue of *Ex Parte Young*.[76]  For the reasons discussed below, the Court disagrees.

A.      Waiver

According to plaintiffs, the SLA waived its sovereign immunity "[b]y first conceding that Article 78 was the proper forum for review, then intentionally (and vindictively) eliminating that forum by withdrawing the suspension for the sole purpose of mooting the proceeding."[77]  While the SLA's gamesmanship is not lost on the Court, this behavior cannot properly be considered a waiver of its sovereign immunity.

"[A] State's constitutional interest in immunity encompasses not merely whether it may be sued, but *where* it may be sued."[78] Accordingly, "there will be no waiver of immunity against federal suit unless the state specifies its intention to consent to suit in federal court."[79] "Consent to suit in state court" therefore "does not confer federal-court jurisdiction over states and their agencies."[80] Based on these principles, the SLA's consent to suit in an Article 78 proceeding in New York State court did not waive its immunity to suit in this Court.

---

York State Liquor Authority).

[76]     209 U.S. 123 (1908).

[77]     Opp. [Dkt. 72] at 13.

[78]     *Minotti v. Lensink*, 798 F.2d 607, 610 (2d Cir. 1986) (*quoting Pennhurst*, 465 U.S. at 99).

[79]     *Id.* (*citing Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241, (1985)).

[80]     *Cajuste v. Lechworth Developmental Disabilities Serv.*, No. 03-cv-0161 (RCC), 2005 WL 22863, at *3 (S.D.N.Y. Jan. 5, 2005).

The SLA's decision to rescind the Suspension Order is even less relevant to whether it waived its sovereign immunity.  While that decision may have mooted plaintiffs' Article 78 proceeding, it does not follow that the SLA now is amenable to suit in this Court.  There has been no "express" and "unequivocal" consent to suit in this Court.[81]

B.      *Ex Parte Young*

Notwithstanding the Eleventh Amendment, *Ex Parte Young* generally allows claims for injunctive relief to proceed against states and state agencies.[82]  "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"[83]

Plaintiffs argue that their claim for injunctive relief may proceed against the SLA. However, the amended complaint seeks injunctive relief only to "stay[] the suspension of plaintiffs' liquor license."[84]  The SLA rescinded the Suspension Order after it was stayed by Justice Engoron during plaintiffs' first Article 78 proceeding.[85]  In addition, the Suspension Order suspended Cloister

---

[81]

    *Doe v. Pataki*, 481 F.3d 69, 78 (2d Cir. 2007) (*quoting College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666, 680 (1999)).

[82]

    209 U.S. 123 (1908).

[83]

    *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (*quoting Idaho v. Coeur d'lene Tribe of Idaho*, 521 U.S. 261, 296 (1997)).

[84]

    Am. Compl. at the Wherefore Clause.

[85]

    *See In re The Cloister East, Inc.*, Index No. 157157/2020 (N.Y. Sup. Ct.), Doc Nos. 38, 72.

Café's liquor license only "until such time as [that] Order [was] lifted, or until a final Order [became] effective in connection with the disciplinary proceeding directed [t]herein to be commenced by the State Liquor Authority."[86]   Those disciplinary proceedings now are complete and resulted in the cancellation of Cloister Café's liquor license.  Accordingly, the Suspension Order has been stayed, rescinded, and – by its own terms – no longer is in effect.[87]  Any constitutional violation in the issuance of the Suspension Order no longer is "ongoing."  No relief from that order would have any "prospective" effect.[88]

Plaintiffs argue that injunctive relief nonetheless remains necessary because the SLA continues to violate their right to due process and thus may suspend their liquor license in the future. The Court largely agrees with plaintiffs that the SLA's behavior in this case is troubling.  Its actions in this litigation – in the context of prior state court cases challenging summary suspension orders – appear to be bad faith efforts to avoid judicial review of its summary suspension orders.  In fact, even after representing to the Court that the Suspension Order would be subject to Article 78 review, the SLA mooted plaintiffs' Article 78 petition so that the Suspension Order would be unreviewable.

Nevertheless, this Court cannot avoid the conclusion that, for this particular plaintiff, there no longer is any ongoing violation which realistically could be remedied by injunctive relief staying the Suspension Order.  To date, Cloister Café's liquor license has been cancelled and their

---

[86] Dkt. 30-7 at 5.

[87] In opposing defendants' motion to dismiss, plaintiffs appear to seek injunctive relief from various alleged misconduct. However, the amended complaint seeks an injunction staying enforcement of the Suspension Order only.  Am. Compl. at the Wherefore Clause.

[88] *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (*quoting Idaho v. Coeur d''lene Tribe of Idaho*, 521 U.S. 261, 296 (1997)).

Article 78 petition challenging that order has been dismissed on the ground that Cloister Café lacks legal capacity to sue.[89]   While Cloister Café has moved for renewal and appealed from the state court's dismissal,[90] it is unclear whether the Article 78 proceeding will be reinstated.   Critically, even if it the Article 78 action were to proceed, it would remain speculative whether plaintiffs will succeed in vacating the cancellation of Cloister Café's liquor license.[91]   Finally, even if their liquor license were reinstated, plaintiffs have not established that it would be reasonable to expect that any alleged constitutional violation from the summary suspension would recur.   Accordingly, an injunction staying the suspension of Cloister Café's liquor license no longer would provide plaintiffs with any relief.

Finally, plaintiffs' reliance on the Court's prior denial of their motion for a preliminary injunction "without prejudice to renewal if any Article 78 proceeding . . . does not result in disposition on the merits"[92] is misplaced.   A denial without prejudice is not a guarantee that the claim for injunctive relief will remain relevant regardless of the circumstances.[93]

---

[89]   *In re The Cloister East, Inc.*, Index No. 151728/2021 (N.Y. Sup. Ct.), Doc No. 71.

[90]   *Id.*, Doc Nos. 73, 105.

[91]   Conrad Decl., Ex. L.

[92]   Opp. at 10 (*quoting Cloister E.*, 483 F. Supp. 3d at 244).

[93]   In any case, plaintiffs misconstrue the Court's prior ruling.   As that decision makes clear, the Court allowed for renewal in case the SLA successfully argued in state court that the Suspension Order was not subject to Article 78 review.   *Cloister E.*, 483 F. Supp. 3d at 238-40 & n. 81 (addressing prior instances where the SLA argued that a summary suspension is not subject to Article 78 review and noting that the SLA had "changed its position on this issue several times during this lawsuit.").   That did not occur.   In fact, plaintiffs successfully obtained a stay of the Suspension Order through their Article 78

For each of these reasons, *Ex Parte Young* is inapplicable and plaintiffs' claims against the SLA must be dismissed.  However, that dismissal is without prejudice to the filing of a motion for leave to file a supplemental complaint as set forth below.

## III.    *Claims Against the Individual Defendants*

The amended complaint asserts claims also against the Individual Defendants in their individual capacities.  They now move to dismiss those claims for failure to state a legally sufficient claim and on the bases of qualified immunity.  Both of these arguments are properly considered on a motion to dismiss under Rule 12(b)(6).[94]

To survive a motion to dismiss under Rule 12(b)(6), plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face."[95]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

---

proceeding. *In re The Cloister East, Inc.*, Index No. 157157/2020 (N.Y. Sup. Ct.), Doc No. 38.  Plaintiffs Article 78 proceeding, however, was dismissed because they no longer had any prospective deprivation to complain of.

[94]    *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74-75 (2d Cir .1998) ("It is [] well established that an affirmative defense of official immunity should be resolved as early as possible by the court, and may be resolved by Rule 12(b)(6) if clearly established by the allegations within the complaint." (citations omitted)).

[95]    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

defendant is liable for the misconduct alleged."[96]  However, a complaint that offers only "labels and

conclusions . . . will not do."[97]

In considering this motion, the Court accepts as true all factual allegations in the

complaint and draws all reasonable inferences in the plaintiffs' favor.[98]  The Court may "rely upon

documents attached to the complaint as exhibits[] and documents incorporated by reference in the

complaint."[99]  Moreover, "when a plaintiff chooses not to attach to the complaint or incorporate by

reference a document upon which it . . . relies and which is integral to the complaint," the Court

nevertheless may consider the document in deciding the defendant's motion to dismiss.[100]  The Court

may consider also "matters of which judicial notice may be taken."[101]

---

[96]

 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[97]

 *Twombly*, 550 U.S. at 555.

[98]

 *ATSI Commc'ns. Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[99]

 *Halebian v. Berv*, 644 F.3d 122, 130 n. 7 (2d Cir. 2011).

[100]

 *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (internal
quotation marks and alterations omitted).

 Here, the Court concludes that the Suspension Order and the Notice of Pleading, the
authenticity of which are not disputed, either are incorporated by reference in or are integral
to the amended complaint and properly are considered on this motion to dismiss.

[101]

 *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

 Here, the Court may properly take judicial notice of the orders issued in the Article 78
proceedings. *Id.* at 774 ("courts routinely take judicial notice of documents filed in other
courts, again not for the truth of the matters asserted in the other litigation, but rather to
establish the fact of such litigation and related filings.").  The Court also may take judicial
notice of "the New York State Executive Orders," *Elite Union Installations, LLC v. Nat'l
Fire Ins. Co. of Hartford*, No. 20-cv-4761 (LJL), 2021 WL 4155016, at *4 (S.D.N.Y. Sept.

As noted above, plaintiffs assert three claims against the Individual Defendants.  First, they claim that the Suspension Order violated their rights to procedural due process.  Second, they claim that the administrative proceeding to cancel or revoke their liquor license did so as well. Finally, they claim that the SLA treated them unfairly and denied them equal protection of the laws.

### A.    *Procedural Due Process – the Suspension Order*

### i.    *Personal Involvement*

Plaintiffs claim that the summary suspension of Cloister Café's liquor license violated their right to procedural due process because they were not provided notice and an opportunity to be heard before the Suspension Order was entered.[102]  They claim that each of the Individual Defendants is liable for the alleged failures.

"In order for an individual to be subject to Section 1983 liability . . . that individual must have had 'personal involvement . . . in [the] alleged constitutional deprivations.'"[103]  In addition, the Individual Defendants "cannot be held legally accountable for the alleged process failure" if they did not have the "power to provide process to the plaintiff."[104]  Accordingly, plaintiffs may only state a claim for the failure to provide a hearing against the Individual Defendants who had "the power"

---

13, 2021), and the relevant guidance issued by the DOH, *Jones v. Cuomo*, No. 20-cv-4898 (KPF), 2021 WL 2269551, at *1 (S.D.N.Y. June 2, 2021).

[102]    Am. Compl. at ¶ 138.

[103]    *Rosu v. City of New York*, No. 11-cv-5437 (DAB), 2012 WL 6582534, at *5 (S.D.N.Y. Dec. 13, 2012) (*quoting Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir.1991)), *aff'd*, 742 F.3d 523 (2d Cir. 2014).

[104]    *Velez v. Levy*, 401 F.3d 75, 93 (2d Cir. 2005).

to decide whether to summarily suspend plaintiffs' liquor license without a hearing pursuant to section 401(3) of the SAPA.[105]  As the Suspension Order makes clear, that decision was made only by the SLA Board members Bradley, Fan, and Ford.[106]

Plaintiffs do not allege that any other Individual Defendant was personally involved in the decision to suspend Cloister Café's liquor license summarily and without notice and a hearing. Plaintiffs allege that defendants Stravalle, Marisco, and Meyerhoff provided the SLA Board with incorrect and misleading information,[107] and defendant Donohue signed the Suspension Order as Secretary to the Authority.[108]  However, as noted above, the Suspension Order makes clear that none of these defendants participated in the decision with respect to Cloister Café's liquor license suspension.[109]  In addition, plaintiffs do not allege that any of those defendants had the power to provide them with the process sought in this case – i.e., notice and a hearing prior to the suspension

---

[105]

   *Id.*

[106]

   Dkt. 30-7 at 2, 5.

[107]

   Am. Compl. at ¶¶ 89-91, 100-2.

   The Court does not address whether providing inaccurate information to the SLA Board could theoretically amount to a due process violation.  Its decision here is based on the fact that the amended complaint does not assert that the submission of the allegedly incorrect information to the SLA Board was an independent due process violation and plaintiffs have never articulated such a theory.

[108]

   Dkt. 30-7 at 5.

[109]

   *Id.*

of Cloister Café's liquor license. Accordingly, these defendants may not be liable for suspending

Cloister Café's license without a hearing.[110]

### ii.    Qualified Immunity

The remaining Individual Defendants – Bradley, Fan, and Ford – contend that they

are entitled to qualified immunity for their decision summarily to suspend Cloister Café's liquor

license. "Public officials are entitled to qualified immunity 'unless (1) they violated a federal

statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at

the time.'"[111]

Here, the suspension of Cloister Café's liquor license without a hearing would not

have violated plaintiffs' right to due process if (1) there was an "emergency requiring quick action

. . . where meaningful pre-deprivation process would be impractical" and (2) "there [was] an adequate

---

[110]    Defendants argue also that Marsico and Meyerhoff – the SLA associate counsel and general counsel – are entitled to absolute immunity. "[O]fficials of government agencies" are entitled to absolute immunity only when "performing certain functions analogous to those of a prosecutor" or a judge. *DiBlasio v. Novello*, 344 F.3d 292, 297 (2d Cir. 2003). In order to establish that they were performing prosecutorial functions, they must demonstrate that the August 7, 2020 SLA Board meeting shares specific "characteristics of the judicial process." *Id.* at 297-98. In this case, defendants have not provided any basis to conclude that it did. In fact, the SLA Board meeting shared many characteristics with the proceedings at issue in *DiBlassio*, which, for the reasons explained in that case, point against concluding that Marsico and Meyerhoff are entitled to absolute immunity. *Id.* at 298-300.

[111]    *Liberian Cmty. Ass'n of Connecticut v. Lamont*, 970 F.3d 174, 186 (2d Cir. 2020) (*quoting District of Columbia v. Wesby*, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018)).

procedure in place to assess the propriety of the deprivation afterwards."[112] The Court previously explained that the second requirement – an adequate post-derivation procedure – apparently was satisfied in this case by the opportunity to challenge the Suspension Order in an Article 78 proceeding.[113] Thus, there would have been no constitutional violation if emergency circumstances requiring immediate action existed at the time the Suspension Order was entered.

However, determining whether defendants are entitled to qualified immunity does not require the Court to determine whether emergency circumstances *actually* existed at that time. Instead, "the Supreme Court has clarified that a district court confronted with a qualified immunity motion may skip over the first question (was there or was there not a constitutional violation) and answer the [second] question": whether any constitutional violation was clearly established at the

---

[112]     *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 50 (2d Cir. 2009). *See also DiBlasio*, 344 F.3d at 304 ("under certain emergency circumstances, a post-deprivation hearing is all that is required to satisfy due process.").

[113]     *Cloister E.*, 483 F. Supp. 3d at 241.

While plaintiffs now argue that the dismissal of their Article 78 proceeding challenging the Suspension Order renders it inadequate or a "figment" (Opp. at 15), these facts are not alleged in the amended complaint. In any case, the Court is not persuaded that these facts render Article 78 review inadequate. As an initial matter, plaintiffs did successfully obtain a stay of the Suspension Order through their Article 78 proceeding. *See In re The Cloister East, Inc.*, Index No. 157157/2020 (N.Y. Sup. Ct.), Doc No. 38. Furthermore, their Article 78 petition was dismissed because they had obtained – albeit outside of court – the full relief available in that proceeding. *Id.*, Doc. No. 72. Although plaintiffs undoubtably wish they were entitled to additional process – such as an opportunity to sue for damages – the fact "that [plaintiffs] might not be able to recover . . . the full amount which he might receive in a § 1983 action is not . . . determinative of the adequacy of the state remedies." *Hudson v. Palmer*, 468 U.S. 517, 535 (1984). Accordingly, an "Article 78 proceeding[] remain[s] adequate for purposes of procedural due process even if" plaintiffs were unable to "[seek] damages" in that proceeding. *Horton v. Westling*, 765 F. App'x 531, 533 (2d Cir. 2019).

time.[114] "In most instances, that turns out to be the easiest way to dispose of a qualified immunity motion."[115]   Accordingly, the Court turns directly to the question of whether it was clearly established that issuance of the Suspension Order would violate plaintiffs' constitutional rights.

As the Second Circuit has explained, "the standard for determining whether emergency procedures can be invoked [is] well-defined."[116]  However, "[e]ven where the law is clearly established and the scope of an official's permissible conduct is clearly defined, the qualified immunity defense also protects an official if it was objectively reasonable for him at the time of the challenged action to believe his acts were lawful."[117]  Accordingly, "[t]he question to be answered

---

[114]

*In re New York City Policing During Summer 2020 Demonstrations*, No. 20-cv-8924 (CM), 2021 WL 2894764, at *17 (S.D.N.Y. July 9, 2021) (*citing Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

[115]

*Id.*

[116]

*DiBlasio v. Novello*, 413 F. App'x 352, 355 (2d Cir. 2011).

Neither party correctly characterizes the "clearly established" law at issue here.  Plaintiffs contend that "due process is a clearly established right."  Opp. at 22.  While that may theoretically be true, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality."  *City of S.F. v. Sheehan*, 575 U.S. 600, 613 (2015).  "Qualified immunity is no immunity at all if 'clearly established' law can simply be defined" at such a high level of generality.  *Id.*  On the other hand, the Court does not agree with defendants that the law at issue was not clearly established because no Court has ever found section 401(3) of the SAPA unconstitutional.  *See* Br. [Dkt. 66] at 23-24.  It is the application of the emergency procedures in section 401(3) to the facts before the SLA Board that plaintiffs contend violated their right to procedural due process.

[117]

*Southerland v. City of New York*, 680 F.3d 127, 141 (2d Cir. 2012) (internal quotation marks omitted) (*quoting Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir.2010)).

is whether a reasonable government officer, confronted with the facts as alleged by plaintiff, could reasonably have believed that his actions did not violate some settled constitutional right."[118]

In this case, defendants Bradley, Fan, and Ford would be entitled to qualified immunity if it was "objectively reasonable" for them to "believe" that an emergency existed under the circumstances alleged by plaintiffs.[119]   Such a determination "gives government officials breathing room to make reasonable but mistaken judgments.'"[120] The members of the SLA Board thus are entitled to qualified immunity if their decision was based on "competent evidence allowing [them] to reasonably believe that an emergency [did] in fact exist, or that affording predeprivation process would [have been] otherwise impractical."[121]

Plaintiffs' allegations – even construed in their favor – establish that it was objectively reasonable for the SLA Board to conclude that an emergency existed warranting the summary suspension of Cloister Café's liquor license.  As an initial matter, it is undisputed that it was objectively reasonable for these defendants to believe that the COVID-19 pandemic had caused a public health emergency in August 2020.  Plaintiffs likewise do not contend that it was unreasonable to believe that compliance with the DOH Guidance was necessary to stem the spread

---

118

*In re New York City Policing*, 2021 WL 2894764, at *17.

119

*Schweitzer v. Crofton*, 560 F. App'x 6, 11 (2d Cir. 2014) (officer was entitled to qualified immunity for deciding to remove child without a hearing "because it was 'objectively reasonable'" to "believe 'that there was an immediate threat to the safety of [plaintiff's child]'").

120

*Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

121

*DiBlasio*, 413 F. App'x at 355.

of the virus.  Instead, plaintiffs allege only that no emergency existed because they were complying with these guidelines.[122]  Accordingly, the issue presented is whether in the circumstances, as alleged in the amended complaint, it was objectively reasonable for the SLA Board to believe that plaintiffs' conduct had created an emergency.  The Court concludes that it was.

First, plaintiffs allege that Marsico informed the SLA Board that Cloister Café had established an "illegal structure that was really three walls of neighboring buildings with a ceiling on top."[123]  Plaintiffs further allege that Marsico failed to inform the SLA Board that the ceiling was actually a "cloth awning," that there were "only two walls of neighboring buildings," or that the "temporary enclosure was approved by the Department of Buildings and that the space is deemed to be an outdoor space."[124]  They do not allege that the SLA Board was provided with any evidence indicating that the information provided by Marsico was incorrect.  Based on those allegations, it was plainly reasonable for the SLA Board to believe that Cloister Café was serving patrons in an "enclosure with three walls and a fabric roof"[125] in violation of the DOH Guidance.

Second, plaintiffs allege that Marsico and Meyerhoff told the SLA Board that there were seventy people "inside" Cloister Café, that the maximum capacity at Cloister Café was "half of seventy-four," and that it was "way over occupancy."[126]  They allege also that Marsico and

---

[122]     Am. Compl. at ¶ 113.

[123]     *Id.* at ¶ 61.

[124]     *Id.* at ¶¶ 62-65.

[125]     Dkt. 30-7 at ¶ 6.

[126]     Am. Compl. at ¶ 66, 79.

Meyerhoff "failed to inform the Board that the amount of people present in the Cloister Café was within the parameters permitted occupancy."[127]  Plaintiffs once again do not allege that the SLA Board knew or should have known that the information provided by Marsico and Meyerhoff was incorrect.

In light of the information allegedly provided to the SLA Board, the Court cannot say that it was objectively unreasonable to conclude that patrons at Cloister Café were "inside the establishment" or in an illegal outdoor "enclosure" and "mingling amongst each other" in a manner that threatened the "health, safety and welfare" of the public.[128]  Whether or not this conclusion ultimately was correct, the SLA Board's decision was not "plainly incompetent" or a "knowing[] violat[ion] [of] the law" for which qualified immunity would not apply.[129]

Finally, while plaintiffs allege that the SLA Board improperly relied on the *Gothamist.com* article in deciding to suspend their license,[130] that does not negate the SLA Board's reliance on information allegedly provided by Marsico and Meyerhoff. Accordingly, plaintiffs have not alleged adequately that it would have been unreasonable for the SLA Board to have believed that emergency circumstances existed that warranted the summary suspension of Cloister Cafe's liquor license.  Accordingly, that decision is entitled to qualified immunity.

---

[127]

  *Id.* at ¶ 80.

[128]

  Dkt. 30-7 at ¶¶ 6-7, 9.

[129]

  *Carroll v. Carman*, 574 U.S. 13, 17 (2014).

[130]

  Am. Compl. at ¶ 105.

B.      *Procedural Due Process – the Revocation Hearing*

Next, plaintiffs claim that their right to procedural due process was violated because "[p]rior to any administrative hearing and having heard no evidence, the Chairman of the Board . . . openly recommended that Plaintiffs shall not be returned their License on a permanent basis."[131] Plaintiffs thus contend that they "have not been and cannot be afforded a meaningful and appropriate hearing."[132] Although not clearly articulated in the amended complaint, the theory underlying that claim appears to be that Chairman Bradley's alleged bias required his recusal from the SLA Board's decision whether to permanently revoke or cancel Cloister Café's liquor license.[133]

As an initial matter, even assuming that claim has any merit, plaintiffs have not alleged that any of the Individual Defendants other than Chairman Bradley would have the power to provide the process sought in this claim.  Accordingly, only Chairman Bradley may be held liable for any alleged due process violation.[134]

In any case, this claim fails because "any injury that the plaintiffs have suffered or may suffer in the revocation proceeding . . . could be remedied by an Article 78 proceeding."[135]  Plaintiffs

---

131
    *Id.* at ¶ 146.

132
    *Id.* at ¶ 151.

133
    *See* Opp. at 18 (arguing that "Chairman Bradley should have recused himself based on his clearly prejudicial behavior.").

134
    *See Velez*, 401 F.3d at 93.

135
    *Cloister E.*, 483 F. Supp. 3d at 243.

    "Where, as here, a given procedure includes 'some form of pre-deprivation hearing' and post-deprivation remedies with 'the opportunity to obtain full judicial review,' the

have not alleged or argued that an Article 78 proceeding would not provide an adequate post-deprivation review of the SLA's decision to cancel Cloister Café's liquor license.  While it is currently unclear whether plaintiffs' Article 78 petition will be heard on the merits, such future events, which are not alleged in the amended complaint or raised by the plaintiffs, cannot defeat defendants' motion to dismiss.  However, plaintiffs may move to file an amended and supplemental complaint, as set out below, based on the factual developments that have occurred since this case began.

## C.    Equal Protection

Plaintiffs' final claim is for an equal protection violation on the premise that defendants "reli[ed] on a third-party publication [the *Gothamist.com* article] over facts that should have been corroborated or undermined by means of its own investigation and the failure to conduct a proper investigation," and they thereby caused the plaintiffs to be "treated arbitrarily unequally in comparison with those establishments given fair hearings based on admissible evidence."[136]

Plaintiffs do not allege that they are members of a protected class.  Accordingly, to claim an equal protection violation, they must plausibly allege that they were denied equal protection as a class-of-one.  A class-of-one claim is properly stated "where the plaintiff alleges that she has been

---

'combination' of the two provide due process" sufficient to remedy alleged bias by the original decision maker.  *Doolen v. Wormuth*, 5 F.4th 125, 135 (2d Cir. 2021) (*quoting Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 466-67 (2d Cir. 2006)).  In fact, the Second Circuit has concluded where Article 78 review is available, allegations of bias on the part of the hearing officer are insufficient to sustain a claim under the due process clause.  *See Locurto v. Safir*, 264 F.3d 154, 174-5 (2d Cir. 2001).

[136]   Am. Compl. ¶ 154.

intentionally treated differently from others similarly situated ***and*** that there is no rational basis for the difference in treatment.'"[137] For the second element, plaintiffs must allege that Cloister Café "and a comparator are '*prima facie* identical'" so that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy" or "a mistake."[138]

Plaintiffs' entirely fail to meet this standard. Instead, they allege only that the SLA treated them unfairly compared to "those establishments given fair hearings based on admissible evidence."[139] They do not allege any details whatsoever about these establishments or the circumstances of the allegedly "fair hearings" that these establishments were provided. Accordingly, they do not even come close to alleging an "extremely high degree of similarity between themselves and the persons to whom they compare themselves."[140]

Plaintiffs' arguments to the contrary do not have any merit. Primarily, they argue that they must have been treated unfairly because any contrary conclusion would mean that the SLA treats all entities unlawfully.[141] This "gotcha!" argument is completely frivolous and misses the point. Among other issues, plaintiffs fail to address the fact that "the [a]mended [c]omplaint is silent as to

---

[137]
*Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010) (emphasis added) (*quoting Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

[138]
*Hu v. City of New York*, 927 F.3d 81, 92 (2d Cir. 2019).

[139]
Am. Compl. ¶ 154.

[140]
*Lilakos v. New York City*, 808 F. App'x 4, 8-9 (2d Cir. 2020) (*quoting Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)).

[141]
Opp. at 20.

a whole host of factors that could legitimately justify" the SLA's alleged behavior.[142]  For example, it does not indicate whether the alleged comparator establishments were accused of violating COVID-19 related restrictions in the same manner that the SLA allegedly believed Cloister Café had.  While the Court does not suggest that this particular omission is dispositive, without any allegations whatsoever about the comparator establishments, the Court cannot plausibly infer that the SLA's treatment of Cloister Café was unrelated to a legitimate government policy.[143]

However unfairly plaintiffs believe they were treated – and the Court does not reject their belief that they were – the allegations in the amended complaint are insufficient to allege an equal protection violation.

### *Conclusion*

For the forgoing reasons, defendants' motion to dismiss the amended complaint [Dkt. 65] is granted on the ground that it fails to state a claim upon which relief may be granted.  As this saga has not yet reached its end, however, plaintiffs may move for leave to file an amended and supplemental complaint pursuant to Rule 15(d), which shall be attached to any such motion, by the earlier of November 26, 2021 or thirty days after the current Article 78 proceeding [Index No. 151728/2021 (N.Y.Sup.Ct.)] is finally resolved.  In the event that the Article 78 proceeding is still

---

[142]     *Hu*, 927 F.3d at 100.

[143]     To the contrary, the facts alleged in the amended complaint and the governments' interest in stemming the spread of COVID-19 strongly suggest that Cloister Café was not singled out for any impermissible reason. *Cf. Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67, 208 L. Ed. 2d 206 (2020) ("Stemming the spread of COVID-19 is unquestionably a compelling interest").

pending as of November 26, 2021, plaintiffs shall file a status update with the Court seeking additional time to submit any such motion.

       SO ORDERED.

Dated: September 28, 2021

_____

Lewis A. Kaplan
United States District Judge